No. 48,395

State of Kansas, *Appellee*, v. Kenneth D. Colbert, *Appellant.*

(557 P. 2d 1235)

Opinion filed December 11, 1976.

*James F. Richey,* of Rumsey & Richey, of Wichita, argued the cause, and *Richard H. Rumsey,* of the same firm, was with him on the brief for the appellant.

*Christopher Allan Randall,* Assistant District Attorney, argued the cause, and *Curt T. Schneider,* Attorney General, *Keith Sanborn,* District Attorney, *Stephen E. Robison,* Assistant District Attorney, and *Gary Blanton,* Legal Intern, were on the brief for the appellee.

The opinion of the court was delivered by

KAUL, J.: Following a joint trial to a jury defendant-appellant, Kenneth D. Colbert, and a codefendant, Harold L. White, were each convicted of aggravated robbery (K. S. A. 21-3427), conspiracy (K. S. A. 21-3302), and kidnapping (K. S. A. 21-3420). The sentences imposed were ordered to run concurrently.

The points on appeal go to the sufficiency of the evidence to sustain the conspiracy and kidnapping convictions and the trial court's refusal to instruct on lesser offenses in connection with the aggravated robbery charge.

The state's evidence disclosed that on February 5, 1975, Harold L. White, a codefendant in the instant case, and Andrew Davis, the complaining witness, were employed by Boeing Aircraft Company in Wichita. Both men were working the second shift, from 4:30 p. m. to 1 a. m.

Davis testified that on or about February 2, 1975, he promised to lend White the sum of $25.00. At the time Davis explained to White that he was going to get a loan with which to make a payment on a car.

On February 5 Davis drove himself to work, arriving about 4 p. m. By 4:10 he had obtained his loan from the Boeing Credit Union and immediately cashed the check at a supermarket and reported for work at 4:30 p. m. At approximately 5:50 p. m., before the first break at work, he made the $25.00 loan to White as promised. Davis further testified that between 7 and 8 p. m. White asked him for a ride home from work, which request was refused by Davis. Subsequently, White repeated the request three of four times—finally Davis reluctantly agreed to take White home.

Davis testified that because of White's persistence in requesting a ride and learning about the loan proceeds, he became apprehensive about the trip home. With this suspicion in mind, Davis removed part of the money from his billfold and put it in his front pocket, leaving $193.00 in the billfold. Davis further testified that he saw White leave the area in which both worked three or four times during the evening to go to a tool crib near a telephone.

At 1 a. m. the following morning both Davis and White got off work. Davis said he tried to leave without White ". . . because I didn't really want to take him. I kind of figured he had something up his sleeve. . . ." However, as he was leaving the plant Davis

ran into White on the stairs. Concerning this encounter, Davis testified:

"When I was about to come back up the stairs, I happened to find him and he was very desperate when he saw me and he asked me what was I trying to do, go off and leave him? I told him I wasn't."

The two men then went to Davis's car and set out for White's home in the Plainview area of Wichita.

From the Boeing plant Davis was directed by White down Oliver Street and from there he was told to turn on Fees Street. Suspecting he was being led astray, Davis asked White, "Are you sure this is the Plainview vicinity? And he told me yes." After turning onto Fees Street, Davis drove by an automobile which had its hood raised and a man standing nearby. According to Davis, White said, "That looks like my car," and then asked Davis if he would turn around and help start the car with battery jumper cables. Davis agreed and drove back to the scene, parking his car facing White's car so the jumper cables would reach. White then told Davis to turn off his car lights, but Davis declined. At this time the individual who had been standing beside White's automobile (later identified as defendant) approached with a mask over his face and a gun in his hand which he pointed at Davis. According to Davis he was forced to get out of the automobile, turn around and put his hands up. Defendant then went through Davis's pockets, removing the billfold containing $193.00, but apparently overlooking the money in the witness's front pocket.

White exited from the car and stated to defendant, ". . . Man, what are you doing? We are trying to help you and you want to do us that way. . . ." Thereupon defendant checked White's pockets.

At this point Officers Roland Meyers and Don Knard of the Wichita Police Department drove by in a patrol car. The officers were on routine patrol, but stopped when they were alerted by the fact the stalled car had a rag over the license tag, obscuring the numbers. Davis heard White say, ". . . Aw, shoot, here comes the cops. . . ." White then approached the officers and fielded their initial questions, responding that nothing was going on, they were just having car trouble. Defendant ran from the scene, but was apprehended by Officer Meyers, handcuffed and returned to the police car.

Meyers testified that as he first approached defendant near the stalled car he heard something drop. Meyers looked down and

saw defendant kick what appeared to be a gun. A .38 caliber Smith & Wesson revolver was located by the officers in the snow by the right front tire of White's automobile.

Officer J. W. Harper, who was also patrolling the area, arrived at the scene within a few minutes after the arrival of Knard and Meyers. Harper joined the interrogation of Davis, White and defendant. The confusing explanations given by White caused the officers to become suspicious. A *Miranda* warning was given to White and defendant and interrogation was pursued by the officers. Harper testified that White said Davis was driving him home when they saw a person having car trouble and when they pulled over to help, someone had robbed them and that the gun, which had been discovered by the officers, belonged to the robber. This statement of White's to Harper was entirely different from White's previous statement to Knard and Meyers when they first arrived at the scene.

After the officers unraveled the stories of Davis, White and Colbert, White and Colbert were arrested and taken to the police station.

At the police station an inventory search of defendant's person revealed he was in possession of an envelope containing an employee's statement of earnings from Boeing which had the name of Harold White on it, a twenty dollar bill and two one dollar bills. Also recovered from defendant was Davis's billfold containing $193.00.

White and Colbert were placed in the same jail cell where they spent the rest of the night.

The testimony of White and Colbert at trial was further discredited by the testimony of Detective Jerry Fraipont, who, after a *Miranda* warning, questioned both men the following morning. At this time, after spending the rest of the night in a jail cell with defendant, White again changed some aspects of his previous statements so that his story corresponded with defendant's attempted explanation of the affair. In response to questions by Fraipont, concerning his statements to Officers Knard, Meyers and Harper, White stated, ". . . Well, those officers were lying. I never said anything of such a kind to them. . . ." Davis also changed his version to some extent from that given to the officers the previous night. The variances and inconsistencies of the stories of defendant and White were all brought out at trial through the testimony of the police officers.

In his first point on appeal, defendant claims the trial court erred in refusing to give instructions on theft (PIK 1975 Supp. [Criminal] 59.01, K. S. A. 21-3701) and theft of lost or mislaid property (PIK [Criminal] 59.02, K. S. A. 21-3703). Defendant requested that the instructions mentioned be given. The trial court responded by ruling:

". . . Well, the Court's not going to give either of those instructions, primarily because the instruction on theft, lost or mislaid property from the Statutes says that the defendant must know or learn the identity of the owner thereof and under the evidence in this case, the defendant Colbert has denied that all the way through even by his own testimony that he knew or ever learned the identity of the owner of the property. I don't think there is any evidence here that would support an instruction on just plain theft."

The record supports the trial court's ruling. One of the elements of theft of lost or mislaid property is that it be committed by a person ". . . who knows or learns the identity of the owner thereof, . . ." (K. S. A. 21-3703). Defendant's own testimony excludes a theory of guilt on this lesser offense. On direct examination defendant testified:

". . . I did not know whose wallet it was. I figured if it was his [Davis's] he would have asked for it back. . . ."

Where evidence negates a lesser degree of guilt an instruction thereon need not be given. On this point we held in *State v. Cameron & Bentley,* 216 Kan. 644, 533 P. 2d 1255:

"A trial court is required to instruct on lesser included offenses where there is support therefor in the evidence, but the failure to instruct on a lesser degree of an offense charged does not constitute error where the evidence negatives a lesser degree of guilt. (Following *State v. Hollaway,* 214 Kan. 636, [Syl. 4], 522 P. 2d 364.)" (Syl. 5.)

For a similar reason, we find no error in the trial court's refusal to submit defendant's requested instruction on theft. Defendant's defense was that he had committed no crimes at all. Defendant's own testimony refutes his purported theory of simple theft. In giving his version of what occurred at the time of his arrest, defendant testified at trial:

". . . [A]t that time I told the police that I had picked up a wallet and the dude just started saying that he was robbed when all he had to do was ask me for the billfold I would have given it to him."

The remainder of defendant's trial testimony was consistent with this statement, thereby negating the existence of an intent to permanently deprive—a necessary element of theft as defined in

21-3701. Under the evidence presented by both the prosecution and the defense, the defendant was either guilty of aggravated robbery or he was innocent of any crime.

In points two and three defendant challenges the sufficiency of the evidence to sustain the conspiracy and kidnapping convictions. Defendant claims error in the trial court's refusal to dismiss these two charges at the conclusion of the evidence on the grounds that the evidence failed to establish a prima facie case of either conspiracy or kidnapping. As to point three, concerning the kidnapping count, defendant asserts that the only way defendant could be found guilty of kidnapping is through and by the results of the conspiracy charge. The only argument made by defendant on this point is that if error is found in the conspiracy count then it follows the kidnapping conviction must also fall. We agree with defendant's position that the kidnapping must stand or fall on the state's proof of conspiracy. The kidnapping charge was based on deception (K. S. A. 21-3420) which, in this case, was intertwined with and depended upon proof of conspiracy. However, we do not agree with defendant that the state failed to make out a prima facie case on the conspiracy charge.

The essence of our new code conspiracy statute (K. S. A. 21-3302) is an agreement to commit a crime coupled with an overt act in furtherance of the agreement. (*State v. Campbell*, 217 Kan. 756, 539 P. 2d 329, cert. den. 423 U. S. 1017, 46 L. Ed. 2d 389, 96 S. Ct. 453.) See, also, discussion appearing in Vol. 19 Kansas Law Review, "Kansas' New Conspiracy Law," p. 799. The trial court's instructions on the elements of conspiracy accorded with the statute and defendant has lodged no complaint in this regard.

The state's theory of the case was that White learned several days in advance through asking Davis for a $25.00 loan that Davis was going to obtain a substantial sum of money for a payment on an automobile. As a result of receiving this information, White and defendant conceived a plan whereby Davis, after he had obtained the money would, by deception, be led onto a lightly traveled street where a robbery by defendant would be staged and that when White learned that Davis had the money the plan would be finalized by a telephone call from White to defendant. Reduced to its essentials, the conspiracy charge was that White and defendant (1) agreed (2) to kidnap Davis by deception and in furtherance of the agreement (3) persuaded Davis to drive to a place where (4)

the defendant could, and did, rob Davis. The direct testimony of Davis, corroborated by that of the officers, established elements (3) and (4). We believe the record reflects ample circumstantial evidence to establish (1) and (2).

First, the state presented evidence that during the evening in question codefendant White made three or four trips to the tool crib where a telephone was located. At this time White knew Davis had secured the loan. White finally prevailed upon Davis to take him home from work after asking several times without success. Davis, the state's principal witness, gave no indication that he was told that he was taking White to his car instead of his home. However, on the way home, they happened to pass White's car, which had conveniently stalled on the route which White had directed Davis to take. White had not disclosed to Davis that his car was in the area. The most incriminating fact of all was that the stalled automobile had a rag over the license tag so as to obstruct the view of the license number. Finally, White expressed disappointment at the arrival of the police and tried to get rid of them when they made their timely arrival on the scene during the commission of the armed robbery.

We believe the evidence is subject to a reasonable interpretation that a well-planned "setup" had been arranged between White and defendant.

Viewed in the light required by our rules of appellate review, we believe the circumstantial evidence recited, coupled with the testimony of the officers pointing out the conflicts and confusion in the statements made by defendant and codefendant White, is ample to sustain the conspiracy and kidnapping convictions.

The fact that Davis did not know, at the time, that he was being kidnapped appears to be of no consequence in view of the fact that our kidnapping statute (K. S. A. 21-3420) proscribes *inter alia* the taking of a person by deception. The word deception, as used in the statute, necessarily implies that the victim be unaware that he was being kidnapped.

In reviewing a trial court's denial of a motion for acquittal under K. S. A. 22-3419, the tests to be applied were set out in *State v. Gustin,* 212 Kan. 475, 510 P. 2d 1290, wherein we held:

"A trial judge in passing upon a motion for judgment of acquittal must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable

doubt. If he concludes guilt beyond a reasonable doubt is a fairly possible result, he must deny the motion and let the jury decide the matter. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion." (Syl. 3.)

Our holding in *Gustin* has been followed in the recent cases of *State v. Holloway*, 219 Kan. 245, 547 P. 2d 741; *State v. McCorgary*, 218 Kan. 358, 543 P. 2d 952, cert. denied, 429 U. S. 867, 50 L. Ed. 2d 147, 97 S. Ct. 177; and *State v. Rasler*, 216 Kan. 582, 533 P. 2d 1262.

It has long been the rule of this court that a conviction of even the gravest offenses may be sustained by circumstantial evidence. (*State v. Ritson*, 215 Kan. 742, 529 P. 2d 90; *State v. Hale*, 207 Kan. 446, 485 P. 2d 1338; and *State v. Kennedy*, 124 Kan. 119, 257 Pac. 726.) More recently we have concluded that the probative values of direct and circumstantial evidence are intrinsically similar and there is no logically sound reason for drawing a distinction as to the weight to be assigned to each. (*State v. Wilkins*, 215 Kan. 145, 523 P. 2d 728.) In criminal cases, based upon circumstantial evidence, the test on appellate review is whether there is a basis in the evidence for a reasonable inference of guilt. (See *State v. Ritson*, supra, and cases cited therein.)

We believe the record, viewed in the light required by our rules of appellate review, supports the trial court's denial of defendant's motions because the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, is sufficient to warrant that a reasonable mind might fairly conclude guilt beyond a reasonable doubt. (*State v. Holloway*, supra.)

The judgment is affirmed.