No. 48,445

STATE OF KANSAS, *Appellee,* v. GARRY LEE HOLT, *Appellant.*

(574 P.2d 152)

Opinion filed November 5, 1977.

*Robert Hall,* of Adams, Jones, Robinson, and Malone, Chartered, of Wichita, argued the cause, and was on the brief for the appellant.

*Stephen M. Joseph,* assistant district attorney, argued the cause, and *Curt T. Schneider,* attorney general, and *Vern Miller,* district attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

PRAGER, J.: This is a direct appeal in a criminal action in which the defendant-appellant, Garry Lee Holt, was convicted of aggravated kidnapping (K.S.A. 21-3421), aggravated robbery (K.S.A. 21-3427), two counts of unlawful possession of a firearm (K.S.A. 21-4204), and conspiracy (K.S.A. 21-3302). The facts in the case are essentially as follows: On the afternoon of Friday, October 18, 1974, Debra Starks accepted an offer for a date that evening made

by Steve Hartman, a relative of Debra's neighbor. Steve Hartman did not have a car available to him and suggested that Debra provide her car for the transportation. She agreed to do so. At about 8:30 p.m. Debra drove her 1970 blue Ford Maverick with Steve as a passenger to the Alibi Club on South Broadway Street in Wichita. The defendant, Garry Lee Holt, was present at the Alibi Club when they arrived. Holt had previously arrived at the Alibi Club some time around 7:30 p.m. and had a conversation with Debbie Harris, the barmaid. According to Debbie Harris, Holt requested her to open the side door to the storage room behind the bar. Holt entered the room and asked for a bar towel which he used to wrap a pistol. The pistol, wrapped in the towel, was then placed by Holt on top of the cooler and Holt returned to the bar.

Debra Starks and Steve Hartman arrived at the Alibi Club at about 9:00 p.m. During the evening, in the absence of Steve Hartman, Debra Starks and defendant Holt had a conversation which was mostly small talk. They had met before at the club. By 10:30 p.m. Steve Hartman was acting like he was drunk. He was slouched over at the bar, didn't say anything, and had his eyes closed. According to Debra Starks, Holt approached her and said that a friend had remarked that Steve Hartman had a lot of money on him and Holt wanted Debra to help him "roll" Steve. Defendant offered her money in exchange for her help. According to Debra, at that time she did not offer to help, but neither did she refuse. She returned to the bar and sat with Steve. Steve was still acting drunk. Debra Starks went outside to the parking lot where she had a conversation with a friend, Beverly Branstetter. Beverly testified at the trial that while she and Debra were talking in the parking lot, Holt approached Debra and said he wanted to talk to her. After Beverly Branstetter left, Holt and Debra Starks had another conversation about robbing Steve Hartman. The defendant explained his plan to Debra. He said that when she and Steve were ready to leave, he would get in the car with them and when they got to the Oaklawn area, where Steve Hartman resided, he (Holt) would hit Steve in the head and take his money. They would then dump Steve out and leave him. Following this conversation, which lasted only a few minutes, Debra returned to the bar.

Some time around 11:15 p.m. Steve Hartman fell off his bar

stool. One of the owners suggested that Debra take Steve home because he was drunk. According to Debra Starks, after some delay and at Holt's insistence, she, Steve Hartman, and Holt left the Alibi Club. This was shortly before midnight. Debbie Harris, the barmaid, testified that she heard Holt tell Debra Starks, "Come on, let's go," and that she saw Debra Starks, Steve Hartman, and Holt walk towards the back door when they left the club. The state's evidence showed that the defendant was armed when he left the Alibi Club with Debra Starks and Steve Hartman. Some time earlier that evening Holt told Miss Harris that he wanted back into the storage room to get his gun. Miss Harris testified that she let Holt back in the storage room and saw him take the gun and place it in the back of his jeans underneath his jacket and shirt and saw him walk out of the storage room.

Debra testified that after she, Steve Hartman, and defendant Holt left the Alibi Club, they all got into her Maverick. Debra was driving, Steve Hartman was in the front passenger's seat, and the defendant Holt sat in the back seat on the passenger's side. Debra drove to the Oaklawn area and turned on Chestnut Street. During the trip Steve Hartman gave Debra directions as to where to go. As Debra was rounding a curve on Chestnut Street, she heard some whacks and out of the corner of her eye she saw Holt hitting Steve in the head with the butt of his gun. According to Debra, Holt hit Steve three times and Debra stopped the car. After the car was stopped, Holt told Steve to get out, which he did. Steve was followed by Holt, who was holding a gun in his right hand. Outside the car, Holt told Steve to empty his pockets. Steve threw bills and change on the ground. At the same time Holt took a gin bottle out of the car along with a package of cigarettes and three match books. Debra saw Steve and Holt walking to the back of her car out of her view. She heard a bang and Holt came back and told her, "Let's get out of here." As they drove back to the parking lot of the Alibi Club, Debra asked Holt if he had actually shot Steve Hartman. Holt said that he had shot over Hartman's head to scare him. During the drive Holt told Debra to go back later to the area where the shooting occurred, call the police dispatcher, and tell him that an unknown man about six feet tall, weighing about 180 pounds, with dark hair had done the shooting and that the man had forced her to take him to the Schulte area and drop him off. Debra Starks also testified that Holt told her that he had

broken his gun in striking Steve, and one side of the handgrip was missing. At the parking lot, Holt got a flashlight and he and Debra looked around for the missing handgrip but could not find it. Holt then reminded Debra what he wanted her to tell the police. Holt then left Debra's car and entered the Alibi Club.

Inside the club Holt sat down at the bar and ordered a drink from the barmaid Debbie Harris. According to Miss Harris, Holt again asked her to open the door to the storage room, which she did. Holt walked into the storage room and said, "Take this and put it somewhere, wrap it up in a couple of towels." He handed her a pistol which she again placed in the storage room. Miss Harris testified that the gun was a revolver and that she specifically noticed that the right side of the handgrip was missing. When Miss Harris returned to the bar, she saw Holt sitting at the bar looking very pale. She asked him what was wrong and he said he had to shoot a man. According to Miss Harris, she asked him why he did it. Holt said that he had hit a man on the head about three times and it did not knock him out and that the man told Holt that Holt either had to "beat the hell out of him or kill him." According to Miss Harris, Holt showed her where he shot the man by pointing to his right cheek under his right eye on the cheek bone. That was the exact spot where the bullet entered Steve Hartman's head. Holt then told Miss Harris that, if she was asked by the police, she should say he had been at the Alibi Club since 8:30 p.m. that evening and had never left. Later at about 2:30 a.m. Holt told her that he wanted his gun back and she got it for him from the storage room. She saw him open the cylinder of the gun and remove a spent bullet. She saw Holt put a new bullet in the gun, at which time Holt said he had used the spent cartridge and needed to replace it. Holt later left the Alibi Club.

The state also called as a witness Judy Grob, who had known the defendant Holt for some time. She testified that Holt knocked on the door of her home at about 3:30 a.m. on October 19th and asked her if he could use her car. She said that he could. Miss Grob owned a 1974 Ford Pinto station wagon which she had allowed Holt to use on other occasions. According to Judy Grob, during the conversation about the use of her car, Holt told her that he had kidnapped a man and shot him, that he had to shoot him. Holt told her that he and this girl got this guy out to her car, that they had driven to the country where he had tried to rob the

man, that he had hit the man over the head several times, that they had struggled, and that he had to shoot him in the head. Holt wanted to borrow her car because he had to leave town. According to Miss Grob, Holt showed her a pistol which had a broken handle; a part of the handgrip was gone. Holt stayed at Miss Grob's house for 30 to 45 minutes and left in Miss Grob's station wagon. According to Miss Grob there were no men's clothes in the station wagon at that time.

The state's evidence disclosed that the shooting of Steve Hartman was witnessed by three people other than Debra Sparks. Alvin and Karen Garber were returning home from the theatre when they stopped at the intersection of Chestnut and Juniper Streets in Oaklawn at about midnight. Both of them saw a blue Maverick in the intersection and witnessed the shooting of Steve Hartman. Neither of them could identify the defendant Holt as the assailant. The third witness was James W. Patterson, a school custodian, who walked outside the school about midnight on October 18th to move his car. He saw a dark-colored 1970 or '71 Maverick car in the intersection of Chestnut and Juniper Streets. He saw two men arguing and then one of the men raised his arm to the other and he saw one of the men fall. One of the men ran back to the car and got in the passenger side where the door was open and the car drove away. Mr. Patterson could not identify the defendant Holt as the assailant. The description of the assailant by these three witnesses was somewhat conflicting.

The state called as its final major witness Jo Holt, wife of the defendant. Over vigorous objection from defense counsel on the grounds of marital privilege, the trial court permitted her to testify that when she returned to the Holt home in the early morning hours of October 19, 1974, she observed that the kitchen cabinets were open, and three cartons of Holt's cigarettes and most of his clothing were missing. She also found a note on her bed which read as follows:

"Jo, I had to kill a person tonight. I will be back soon, tomorrow night at your mother's place. Please understand. Garry."

She identified the note as being in the defendant's handwriting and testified that she had not seen the note in the house prior to that time.

In addition to these witnesses, the state called detective Green, who testified that he found a broken-off piece of pistol grip in

Miss Starks's Maverick along with other items. In Miss Grob's Pinto station wagon Green found a .22-caliber pistol, clothes belonging to defendant Holt, cartons of cigarettes, and other items. The .22-caliber pistol found in the station wagon was not the one used to shoot Steve Hartman. It was another .22-caliber pistol which John Howard, a defense witness, testified that he had given to Holt to sell to a third party. The pistol used to shoot Steve Hartman was never found. The state also called Dr. Paul Stein, who had treated Steve Hartman at the hospital following the shooting. He testified that Hartman had been shot in the head, that he had suffered a severe head wound and disability as a result of the shooting, and that Hartman had no recollection of the shooting or his assailant.

The defendant Holt in his defense called witnesses who had been present at the Alibi Club that evening. None of them saw a gun in his possession. One witness testified that he played pool with Holt for one or two hours after midnight and that it would have been impossible for Holt to have left the club for as much as half an hour between 12:00 and 2:00 a.m. The defendant Holt was the final witness. He admitted writing the note to his wife but stated it was written a week earlier about another shooting which occurred when Holt got into a fight with another customer at the Alibi Club. Holt assumed the customer was dead and so he wrote the note. His wife talked him out of running away. Defendant denied having a pistol in his possession on the night of October 18th. It was his story that he had placed his clothes in Miss Grob's station wagon on October 16th and hence they were still in the station wagon when he was arrested on October 19th. He further testified that he had never been inside Debra Starks's Ford Maverick. The case was submitted to the jury, which found the defendant guilty of the charges mentioned above. Holt has appealed to this court claiming trial errors.

On this appeal the defendant contends that the trial court committed reversible error in instructing the jury on the offense of aggravated kidnapping and in submitting that charge to the jury, when the evidence in the case was insufficient to support a charge of aggravated kidnapping. Aggravated kidnapping is defined by K.S.A. 21-3421 as kidnapping when bodily harm is inflicted upon the person kidnapped. The evidence was undisputed that the victim Steve Hartman suffered severe bodily harm

as a result of the shooting. If the state could have established that a kidnapping occurred, it would have been aggravated kidnapping. K.S.A. 21-3420 defines the crime of kidnapping as follows:

"**Kidnapping.** Kidnapping is the taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person:

"(a) For ransom, or as a shield or hostage; or

"(b) To facilitate flight or the commission of any crime; or

"(c) To inflict bodily injury or to terrorize the victim or another; or

"(d) To interfere with the performance of any governmental or political function.

"Kidnapping is a class B felony."

In count No. 1 of the information charging aggravated kidnapping it was specifically alleged that the defendant Holt took Steve Hartman by "deception," with the intent to hold him to facilitate the commission of the crime of aggravated robbery. The term "deception" is defined in K.S.A. 21-3110(5) as follows:

"(5) 'Deception' means knowingly and willfully making a false statement or representation, express or implied, pertaining to a present or past existing fact."

The use of fraud as a substitute for force in effecting a kidnapping was recognized at common law and in Kansas statutory law prior to the adoption of our present criminal code in 1970. (*State v. Brown,* 181 Kan. 375, 388, 312 P.2d 832; K.S.A. 21-449 [1964 Corrick].) Kidnapping by fraud or false pretenses has also been made a criminal act in other jurisdictions. (See the annotation with cases cited on the subject of "Kidnapping by fraud or false pretenses" at 95 A.L.R.2d 450.) Under statutes of other states it has been held that the use of fraud as a substitute for force in effecting kidnapping implies false and fraudulent representations amounting substantially to a coercion of the will of the kidnapped person. See for example, *State v. Gough,* 257 N.C. 348, 126 S.E.2d 118, 95 A.L.R.2d 441 (1962), which states the rule in this language:

". . . [T]he crime of kidnapping by its very nature cannot ordinarily be committed by an act to which a person, being capable in law of consenting, consents in a legally valid manner. But where false fraudulent representations or fraud amounting substantially to a coercion of the will of the kidnapped person are used as a substitute for force in effecting a kidnapping, there is in truth and in law, no consent at all on the part of the victim." (p. 356.)

We have examined the cases from various jurisdictions on the subject and have found no cases exactly in point to cover the factual situation presented in this case. We must, of necessity,

determine the issue by construing the applicable Kansas statutes in the light of prior Kansas cases. K.S.A. 21-3420 and K.S.A. 21-3110(5) defining "deception," when read together along with count No. 1 of the information, required the state in this case to prove the following elements to establish aggravated kidnapping by deception:

(1)  That the defendant Holt took the victim Steve Hartman;

(2)  That the taking was the result of the defendant's knowingly and willfully making a false statement or representation, express or implied, pertaining to a present or past existing fact;

(3)  That the taking was done by defendant with the intent to hold Steve Hartman to facilitate the commission of the crime of aggravated robbery;

(4)  That bodily harm was inflicted upon Steve Hartman; and

(5)  That the act occurred on or about October 18, 1974, in Sedgwick county, Kansas.

In our judgment the state, although showing that the victim Hartman was taken in Debra Starks's automobile to facilitate the commission of a crime, failed to introduce evidence that the taking was the result of either Holt's or his confederate Debra Starks's making a false statement or representation pertaining to a present or past existing fact. In other words no "deception" was shown.

The undisputed facts in this case show that Steve Hartman was riding as a passenger in Debra Starks's automobile at his own request because he did not have an automobile available for his use in taking Debra Starks on a date on the evening of October 18th. Steve Hartman at all times intended that Debra should drive him to the Alibi Club and to his home at the conclusion of their date. There is no evidence whatsoever indicating that the subject of transportation was ever mentioned in the course of the evening to Steve Hartman by either Debra Starks or by the defendant Holt. Garry Holt, according to the state's witnesses, solicited and received Debra Starks's approval to assist Holt in "rolling" Steve Hartman during the course of the trip home. At approximately 11:30 p.m., Steve Hartman left the Alibi Club and went to Debra Starks's car. Steve Hartman voluntarily and without any statements or representations being made by the defendant or Debra Starks took his place in Debra Starks's car. Once inside the car Debra Starks drove Steve Hartman directly towards his home,

following his directions for getting there. There is no evidence that Hartman was taken either by force or deception against his will to any place other than where he always intended to go. As noted above, to prove deception the state had to introduce evidence to show that the defendant Holt or his confederate made a false statement pertaining to a present or past existing fact. There was no such evidence.

The state argues that when Steve Hartman left the Alibi Club with the defendant and Debra Starks, he did so under the belief that he was going to be taken to his home and that this belief was generated by the false express and implied representations of Debra Starks that she was going to take him home as she had agreed to do earlier in the evening. Had Steve Hartman known Holt's and Miss Starks's true intentions, he would not have gone with them. In our judgment an intention to commit a robbery during a previously contemplated trip, which is not communicated to the victim, is not, standing alone, sufficient to meet the statutory requirement that to prove kidnapping by deception it must be shown that the taking was accomplished by the making of a false statement or representation pertaining to a present or past existing fact. The previously contemplated trip home in Debra Starks's automobile merely provided the *occasion* for the robbery. There is absolutely no evidence in the case that anything Debra Starks or Garry Holt did or said deceived Steve Hartman into going with them. Steve Hartman was ready to go home and his transportation was to be furnished by Debra Starks.

There is nothing in our conclusion here which is contrary to our holding in *State v. Colbert,* 221 Kan. 203, 557 P.2d 1235. There the victim Davis was induced to drive White, a confederate of the defendant Colbert, by a well-planned scheme in which the victim Davis was deceived into believing that he was taking White to his home. Instead, White had Davis drive him to an area where White's car had been conveniently stalled and Colbert was prepared to rob Davis. The car was parked in a lightly traveled street where it had been previously agreed that the robbery of Davis would be staged. This was held under all the factual circumstances to be kidnapping by deception. In *Colbert* there was evidence that the defendant made false statements or representations which induced the victim to drive his car into a lightly

traveled, relatively remote area where he had not previously intended to go. This is not true in the present case.

In a case where defendant was charged with *theft* by deception we found the false representation to be the defendant's false statement to his aunt that only she and the bank had keys to her safety deposit box. As a result of the false statement, the aunt was deceived into putting her money into a joint savings account and putting the pass book along with other cash into a joint safety deposit box from which defendant stole her property. (*State v. Adair*, 215 Kan. 54, 523 P.2d 360.)

We hold that the trial court committed reversible error in submitting to the jury for its consideration the charge of aggravated kidnapping since the evidence in the case was not sufficient to establish such a charge. On this point we reverse the case and direct that defendant be discharged on count No. 1 of the information which charged aggravated kidnapping.

The defendant's other two points on the appeal arose as a result of the trial court's admitting into evidence the testimony of the defendant's wife, Jo Holt, in regard to the note which she found when she returned to their home during the early hours of October 19th. As pointed out above the note stated: "Jo, I had to kill a person tonight. I will be back soon, tomorrow night at your mother's place. Please understand. Garry." The defense objected to the admission of this testimony as a violation of the defendant's marital privilege. When the objection was made by the defense, the court first permitted Mrs. Holt to testify in the absence of the jury. Then, after further argument on the marital privilege, the court allowed Mrs. Holt to testify about the note before the jury. The defendant's argument against the admission of Mrs. Holt's testimony is based essentially on K.S.A. 60-428 which provides in pertinent part as follows:

"60-428. **Marital privilege, confidential communications.** (*a*) *General rule.* Subject to K.S.A. 60-437 and except as otherwise provided in subsections (*b*) and (*c*) of this section, a spouse who transmitted to the other the information which constitutes the communication, has a privilege during the marital relationship which he or she may claim whether or not a party to the action, to refuse to disclose and to prevent the other from disclosing communications found by the judge to have been had or made in confidence between them while husband and wife. The other spouse or either his or her guardian or conservator may claim the privilege on behalf of the spouse having the privilege.

"(*b*) *Exceptions.* Neither spouse may claim such privilege (1) in an action by one spouse against the other spouse, or (2) in an action for damages for the alienation of the affections of the other, or for criminal conversation with the other, or (3) in a

criminal action in which one of them is charged with a crime against the person or property of the other or of a child of either, or a crime against the person or property of a third person committed in the course of committing a crime against the other, or bigamy or adultery, or desertion of the other or of a child of either, or (4) in a criminal action in which the accused offers evidence of a communication between him or her and his or her spouse, or (5) if the judge finds that sufficient evidence, aside from the communication, has been introduced to warrant a finding that the communication was made, in whole or in part, to enable or aid anyone to commit or to plan to commit a crime or a tort.

"  .  .  .  .  .  .  .  .  .  .  .  .  "

The prosecutor concedes that the defendant's note found by Mrs. Holt in her house in the early morning hours of October 19, 1974, was a marital communication within the definition contained in section (*a*) of 60-428. However, it was the prosecutor's position below and the trial court found that the note as a marital communication was within exception (*b*) (5) of 60-428. The trial court, in admitting Jo Holt's testimony, found that there was sufficient evidence, aside from the communication itself, the note, to warrant a finding by the court that the communication was made, in whole or in part, to enable or aid the defendant to commit a crime. In support of the trial court the prosecutor on this appeal contends, first, that the admission of the note, if erroneous, was harmless error and, second, that the note was written and left in the home to enable or aid the defendant Holt to effect his escape, which was a part of the crimes he had committed.

The defendant on this appeal argues that, even if the defendant Holt had committed the crimes for which he has been convicted, these crimes were fully completed prior to the time the note was allegedly written and therefore the note obviously was not written to enable him to commit or to plan to commit a crime. We have concluded that the trial court was in error in holding that the note, as a privileged marital communication, fell within exception (*b*) (5) of 60-428. There is nothing in the language of the note or in the other factual circumstances which even suggests that it was made, in whole or part, to enable the defendant to commit another crime. The note did not request that his wife do anything. The note merely told his wife that he had committed a crime, told her where he would be, and asked for her understanding. The defendant's obvious reason for leaving the note was to explain to his wife why he would not be home as previously arranged. In our judgment the trial court erred in the admission of the note

into evidence, since it was a privileged marital communication protected by K.S.A. 60-428.

The defendant also complains that his counsel was unduly restricted in his cross-examination of Jo Holt so that he was prevented from showing Mrs. Holt's bias and prejudice toward the defendant at the time of the trial. The state has conceded that defendant's cross-examination was unduly restricted by the trial court. However, we have concluded that the effect of limiting the cross-examination of Mrs. Holt by defense counsel was minimal. Her testimony on direct examination before the jury pertained only to the defendant's note and the identification of the defendant's clothing found in Miss Grob's car when Holt was arrested. We do not consider the trial court's restriction of defense counsel's cross-examination in this case of sufficient significance to reverse the case solely on this point.

Having determined that the admission of the defendant's note to his wife and the limitation of the defendant's cross-examination were erroneous, we must now determine whether they were together sufficiently prejudicial to require a reversal of the convictions on the counts No. 3, 4, 5, and 6. It is the appellant's burden on appeal not only to show error affirmatively, but further to establish that the error alleged resulted in substantial prejudice to his rights. (*State v. Freeman,* 216 Kan. 653, 533 P.2d 1236.) The harmless error doctrine is codified in K.S.A. 60-261, which provides in substance that no error in either the admission or the exclusion of evidence is grounds for setting aside a verdict unless refusal to take such action appears to the court inconsistent with substantial justice. Where there is a wealth of overwhelming and compelling evidence of a defendant's guilt, evidentiary errors must be deemed harmless error. (*State v. Donnelson,* 219 Kan. 772, 549 P.2d 964.) We have concluded that the combined and corroborated testimony of Debra Starks, Debbie Harris, and Judy Grob established defendant's guilt in an overwhelming and compelling manner and that the jury would have reached a verdict of guilty even if the defendant's note had been excluded and further cross-examination of the defendant's wife had been permitted by the trial court. The testimony of the various witnesses is summarized in some detail at the beginning of this opinion. It is difficult to imagine a more compelling demonstration of the defendant's guilt than that provided by the testimony

of Debra Starks, Debbie Harris, and Judy Grob. Debra Starks testified in great detail as to the factual circumstances of the robbery and shooting of Steve Hartman by the defendant Holt. Debbie Harris and Judy Grob testified that the defendant in separate conversations confessed the commission of the crimes to them that evening. The testimony of all three witnesses was tied together by the missing handgrip of the defendant's gun. The internal facts related in the testimony of each were in great detail and mutually corroborative. In view of this testimony, we are convinced that the evidence of Jo Holt was cumulative and did not change the result of the trial. We therefore hold that the admission into evidence of the testimony of Jo Holt pertaining to the defendant's note and the trial court's undue restriction on her cross-examination constituted harmless error. We uphold the convictions of the defendant as to the crimes of aggravated robbery under count No. 3, unlawful possession of a firearm under counts No. 4 and 5, and conspiracy under count No. 6. We also affirm the judgment of sentence imposed by the court on each of those counts.

The judgment of the district court is reversed as to the conviction and sentence imposed for the crime of aggravated kidnapping contained in count No. 1 of the information. The defendant is discharged on that count. The judgment of the district court is affirmed as to the convictions and sentences imposed on counts 3, 4, 5, and 6 of the information in accordance with the views expressed in this opinion.

SCHROEDER, C.J., dissenting as to syllabus 4 (1) and the corresponding portion of the opinion.