PEOPLE v FISHER

Docket No. 92897. Argued December 8, 1992 (Calendar No. 4). Decided June 29, 1993. Dissenting opinion by LEVIN, J., filed June 30, 1993.

Richard E. Fisher was convicted by a jury in the Eaton Circuit Court, Richard M. Shuster, J., of second-degree murder and was sentenced to forty to sixty years in prison. The Court of Appeals, MICHAEL J. KELLY, P.J., and DOCTOROFF and J. T. CORDEN, JJ., affirmed, but remanded for resentencing with instructions to provide a more adequate articulation on the record for the departure from the guidelines (Docket No. 91816). On remand, the court sentenced the defendant to the same term, reasoning that because persons sixty years old seldom commit violent crimes, society would be given some degree of assurance that the defendant would not commit a similar crime. After remand, the Court of Appeals, MICHAEL J. KELLY, P.J., and DOCTOROFF and CYNAR, JJ., again remanded and ordered resentencing by a different judge, finding the rationale totally inappropriate (Docket No. 111583). Thereafter, visiting judge Patrick McCauley, J., sentenced the defendant to twenty-five to fifty years in accordance with the second edition of the sentencing guidelines. After second remand, the Court of Appeals, SHEPHERD, P.J., and WAHLS and R. B. BURNS, JJ., reversed in an opinion per curiam, finding that the lower court erred in considering for sentencing purposes certain statements in the presentence investigation report that were made by the defendant's ex-wife and by using the second edition of the sentencing guidelines, and again remanded for resentencing by yet another judge (Docket No. 119148). The people appeal.

In an opinion by Justice GRIFFIN, joined by Justices BRICKLEY, BOYLE, RILEY, and MALLETT, the Supreme Court held:

The marital communication privilege is a testimonial privilege that is limited to those situations in which a spouse is being examined in court proceedings with regard to communi-

REFERENCES

Am Jur 2d, Criminal Law § 590; Witnesses §§ 296, 301, 302.

Marital privilege under Rule 501 of Federal Rules of Evidence. 46 ALR Fed 735.

cations made during a marriage. The hearsay statements in this case that were written into the presentence report were not made during an examination in a court proceeding and were properly considered by the sentencing court. The circuit court did not err in applying the provisions of the second edition of the sentencing guidelines.

1. MCL 600.2162; MSA 27A.2162 provides that neither spouse may be examined with respect to any communication made during the marriage, a narrow testimonial privilege precluding a spouse being questioned as a sworn witness about such communications. For the privilege to apply, a spouse must testify. Although three contested statements made by Mrs. Fisher to the police were later included in the presentence report and were considered for sentencing purposes by the circuit court, the privilege did not apply because she was not examined as a witness against her husband.

2. Administrative Order No. 1988-4 requires the circuit court to apply the second edition of the sentencing guidelines when sentencing a defendant after October 1, 1988. Use of the revised edition is tied to the date that sentences are imposed rather than the date that the offenses were committed. Because the sentencing guidelines do not establish a presumptive sentencing range, constitutional ex post facto requirements are not violated. The revised guidelines convey no substantive rights, and their application to a defendant who appeals a sentence neither chills the right to appeal nor infringes upon the right to due process. Nor do the revisions limit the discretion afforded the sentencing judge. Because the twenty-five year minimum sentence in this case is within the revised guidelines, it is presumptively valid.

Reversed.

Chief Justice Cavanagh, concurring in part and dissenting in part, stated that the marital communication privilege bars testimony at trial regarding confidential marital communications regardless of whether a spouse testifies; because the privilege applies at sentencing, the same testimony should be barred at sentencing. Once the communication falls within the marital communication privilege, it remains privileged and may not be admitted through a third party. Thus, the disclosure by the defendant's spouse to a police officer of a confidential marital communication made by the defendant should be barred at sentencing.

The marital communication privilege precludes more than just a spouse's testimony. The focus of the privilege is on prohibiting disclosure of confidential marital communications

in court, absent consent. If confidential marital communications were to be admissible because neither spouse testifies, but one spouse discloses the statements to a police officer who then testifies regarding the statements, the consent requirement would be pointless. The marital communication privilege protects the statement itself; thus, a third party to whom a statement later is disclosed also should be prohibited from disclosing the statement in court.

Justice LEVIN, dissenting, stated that it is violative of the marital communications privilege to place before the trier of fact a wife's statements, orally or in writing, concerning statements made to her by her husband. The privilege bars evidence of marital communications without regard to whether the evidence of the marital communication is sought to be introduced through the testimony of a spouse as a sworn witness in court or by some other means such as the testimony of a person who spoke with a spouse or a writing containing statements from one spouse to the other.

There is no reason to distinguish between a deliberate oral communication by a spouse to a third person of a confidential communication, and the deliberate delivery by a spouse to a third person of a written communication. A spouse cannot be examined in court concerning an oral confidential communication simply because one of the spouses deliberately revealed the communication to third persons. Thus, there is no justification to hold that the privilege does not bar the testimony of a witness who spoke to a spouse who reported a confidential marital communication or the admissibility of a document containing statements from one spouse to the other.

190 Mich App 598; 476 NW2d 762 (1991) reversed.

1. WITNESSES — HUSBANDS AND WIVES — COMMUNICATION PRIVILEGE — TESTIMONY.

The marital communication privilege is limited to those situations in which a spouse is examined in court proceedings with regard to communications made during the marriage; for the privilege to apply, a spouse must testify; introduction of marital communications by other means is not precluded (MCL 600.2162; MSA 27A.2162).

2. SENTENCES — SENTENCING GUIDELINES — REVISED EDITION.

The circuit court is required to apply the second edition of the sentencing guidelines when sentencing a defendant after October 1, 1988; use of the revised edition is tied to the date that sentences are imposed, rather than the date that the offenses were committed.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Jeffrey L. Sauter,* Prosecuting Attorney, and *William M. Worden,* Assistant Prosecuting Attorney, for the people.

*Donald L. Correll* for the defendant.

GRIFFIN, J. In this criminal appeal, we must decide whether the marital communications privilege provided by MCL 600.2162; MSA 27A.2162 may be invoked in a sentencing proceeding to preclude consideration by the sentencing court of certain extrajudicial statements made by defendant's estranged wife and set forth in the presentence report. Because defendant's spouse was not examined as a witness, we conclude that the privilege was not available in the circumstances presented here.

We are required also to determine whether the circuit court properly applied the second edition of the sentencing guidelines when this defendant was last resentenced in light of the fact that he earlier had been sentenced and resentenced for the same crime while the first edition was still in effect. We find no error in the application of the guidelines.

I

During an altercation with defendant Richard Fisher, William Tappert was stabbed with a hunting knife at the home of Mary Fisher, defendant's estranged wife. Tappert died the next day, and defendant was charged with first-degree murder. MCL 750.316; MSA 28.548.

The prosecutor maintained that the killing was premeditated and motivated by jealousy. Although defendant and his wife were separated, he visited the home almost daily to see his children. The prosecution contended that defendant was dis-

turbed because Tappert, who was Mary Fisher's boyfriend, had been staying at the house during several of the nights which preceded the altercation.

In testimony at his trial before an Eaton County jury, defendant claimed that Tappert was physically abusing Mary Fisher, and that he was coming to her aid when Tappert was stabbed. According to defendant, the two men engaged in a scuffle, he took out a small hunting knife merely to scare Tappert, and the stabbing was accidental.

The jury rejected defendant's version of the events, and convicted him of second-degree murder, MCL 750.317; MSA 28.549. Thereafter, he was sentenced by Circuit Judge Richard M. Shuster to forty to sixty years in prison. On appeal in the Court of Appeals, defendant's conviction was affirmed. However, because the sentence exceeded the then-recommended minimum sentencing guideline range of seven to sixteen years, the case was remanded to the circuit court for resentencing with instructions to provide a more adequate articulation on the record of reasons for departure from the guidelines. 166 Mich App 699; 420 NW2d 858 (1988).

On remand, the circuit judge reread parts of the original sentencing transcript and again sentenced defendant to forty to sixty years. The judge reasoned that when individuals reach the age of sixty they seldom commit violent acts; therefore, by sentencing the twenty-seven-year-old defendant to a minimum of forty years, society would be given some degree of assurance that he would not commit a similar crime. Defendant again appealed in the Court of Appeals, which found the rationale given for the sentence to be "totally inappropriate" and ordered that the defendant be resen-

tenced by a different judge. 176 Mich App 316, 318; 439 NW2d 343 (1989).

Upon return to the circuit court for further proceedings, the matter was assigned to visiting Judge Patrick McCauley, who sentenced defendant to a prison term of twenty-five to fifty years. Judge McCauley made clear that he had considered the recommended minimum of ten to twenty-five years set forth in the revised, or second, edition of the sentencing guidelines, which had not been in effect when defendant was earlier sentenced.[1]

Defendant appealed for a third time, and the Court of Appeals once again reversed. This time the panel ruled that the lower court erred in two respects: first, in considering for sentencing purposes certain statements in the presentence investigation report that were attributed to Mary Fisher, and, second, by utilizing the revised, or second, edition of the sentencing guidelines. Once again, the case was remanded for resentencing by yet another judge. 190 Mich App 598; 476 NW2d 762 (1991). After the prosecutor unsuccessfully sought rehearing in the Court of Appeals, this Court granted leave to appeal.[2]

II

At the sentencing proceeding conducted by Judge McCauley, defendant challenged the truthfulness of certain statements in the presentence report attributed to Mary Fisher, and he objected on the ground of marital privilege to use of the statements for sentencing purposes. Brief excerpts from the report that include the emphasized challenged statements are:

[1] The second edition of the sentencing guidelines became effective October 1, 1988. Administrative Order No. 1988-4. 430 Mich ci (1988).

[2] 439 Mich 995 (1992).

[1] While there Rick [defendant] looked into the bedroom area and said to Mary [Fisher], *"Is your fuckin boyfriend here? Tell him to come in here so I can stick him a couple of times."*

[2] Bill Tappert fell to the ground and Mary saw that he was bleeding. She started to cry and asked Rick, *"Did you stab him?",* to which he replied, *"Fuck yes I stuck him."*

[3] Mary followed Rick outside of the house and *Rick told her to tell the police that Tappert had fallen into the knife.*

Addressing the issue of marital privilege, the visiting circuit judge noted that defendant and Mary Fisher were no longer married, having divorced during the period between the first and third sentencing proceedings. The court found that the challenged statements implicated only the spousal privilege, and that it was inapplicable because the spousal privilege "terminated at the divorce."

After holding an evidentiary hearing at which defendant and the police investigator testified, the court concluded that the statements as reported were truthful.[3] Thereafter, in explaining its reasons for imposition of the twenty-five to fifty-year sentence, the court left no doubt that each of the challenged statements was taken into account.

Responding to defendant's third appeal, the Court of Appeals disagreed with the trial court's disposition of defendant's claim of statutory

[3] At the hearing, defendant testified and contested the truthfulness of the three statements. While he admitted using profanity in telling Tappert to leave, he denied making the second statement. With regard to the third statement, defendant testified that he was explaining to Mary Fisher how Tappert was wounded, not asking her to lie for him.

On the other hand, a police detective, who interviewed Mary Fisher at the crime scene and obtained her statements, testified for the prosecution regarding the accuracy of the statements contained in the report.

spousal privilege. While acknowledging that the spousal privilege (precluding one spouse from testifying against the other) does not survive divorce, the panel emphasized that the communications privilege encompassed within the same statute precludes testimony by one who is, or was, a spouse "with regard to any confidential communication that occurred during the marriage irrespective of a subsequent divorce." 190 Mich App 603. The panel concluded that at least "the third statement at issue, which was a request by defendant to his estranged wife asking her to lie to the police, was barred by the confidential communications privilege."[4] *Id.*

For reasons other than those articulated by either the trial court or the Court of Appeals, we conclude that the three statements at issue were not precluded from consideration as part of the presentence report by the privilege statute, MCL 600.2162; MSA 27A.2162.

Privileges are governed by the common law, except as modified by statute or court rule. MRE 501. Because there is no court rule governing marital privileges, the statute controls. *People v Love*, 425 Mich 691, 699; 391 NW2d 738 (1986) (opinion of CAVANAGH, J.).

---

[4] The Court of Appeals did not consider the applicability of the marital privilege statute to the second statement, having found that defendant conceded it was made in the presence of a third party, the son of Mary Fisher. 190 Mich 601.

Further, the appeals panel did not consider the statute's applicability to the first statement. Instead, it stated that "[d]uring the sentencing procedures, the sentencing court ruled that . . . it would not consider the first statement," 190 Mich App 603, and then found sentencing error in light of the "failure to strike from the presentence report [the] challenged information . . . ." *Id.* at 604. Although we agree that the mandate of MCR 6.425(D)(3)(a) should be observed, any error in this regard was harmless in light of an express statement on the record by the trial judge that the information was not considered in passing sentence. Under the circumstances, this Court elects to consider the statute's applicability to all three of the challenged statements.

MCL 600.2162; MSA 27A.2162 provides, in pertinent part:

> A husband shall not be examined as a witness for or against his wife without her consent; nor a wife for or against her husband without his consent . . . nor shall either, during the marriage or afterwards, without the consent of both, be examined as to any communication made by one to the other during the marriage . . . .

In *People v Hamacher,* 432 Mich 157, 161-162; 438 NW2d 43 (1989), this Court distinguished between the spousal privilege and the marital communication privilege:

> Section 2162 of the RJA provides two distinct privileges. The first, the spousal privilege, is only applicable when the witness and the spouse are married at the time of trial. This privilege bars one spouse from testifying for or against the other without the other's consent except in (1) actions for divorce, (2) prosecutions for bigamy or for a crime committed against the children of either or both, (3) actions growing out of a personal wrong or injury done by one to the other or the refusal or neglect to furnish the spouse or children with suitable support, (4) cases of desertion or abandonment, and (5) certain cases relating to marriage and title to property.
> The second privilege, the communication privilege, bars one spouse from testifying "as to any communications made by one to the other during the marriage" without the consent of the other. The communication privilege applies whether the testimony is sought "during the marriage or afterwards," as long as the communication occurred during the marriage. Section 2162 of the RJA states no exceptions with respect to the communication privilege.[5]

---

[5] In *People v Vermeulen,* 432 Mich 32, 37-38; 438 NW2d 36 (1989), this Court further explained:

Because the spousal privilege is not available except during the marriage, and defendant and Mary Fisher were divorced when Judge McCauley conducted the sentencing proceeding, it is clear that only the applicability of the communications privilege could be at issue. However, the prosecution contends that the marital communication privilege is inapplicable because it is testimonial in nature; since Mary Fisher was not "examined as a witness" either at trial or during the evidentiary hearing, her statements given to the police and written into the presentence report were not subject to the privilege.

The prosecution further argues that the statements, albeit hearsay,[6] were nonetheless admissible under MRE 1101(b), which provides:

> The rules [of evidence] *other than those with respect to privileges* do not apply in the following situations and proceedings:
>
> * * *
>
> (3) . . . Proceedings for extradition or rendition; *sentencing,* or granting or revoking probation; issuance of warrants for arrest, criminal summonses, and search warrants; and proceedings with respect to release on bail or otherwise. [Emphasis added.]

On the other hand, defendant contends that even though MRE 1101(b)(3) allows the admission

---

Unless and until the statute is amended or a court rule superseding the statute is adopted, the trial courts may not inquire into the viability of the marriage. The communication is barred if it was made during the marriage. We thus adhere to this Court's recent statement in *People v Hamacher,* 428 Mich 884; 402 NW2d 484 (1987), where this Court observed that the statute "contains no exception to the privilege regarding communications between a husband and wife where the husband and wife are separated or are in the process of obtaining a divorce."

[6] See MRE 801(c), 802.

of hearsay evidence at sentencing, the same rule expressly excepts privileged communications from the expansive scope of sentencing information. He argues that the prosecutor should not be able to indirectly introduce privileged evidence that he would be prohibited from educing directly.

The Michigan marital privilege statute does not specifically address situations in which a confidential communication inadvertently or purposefully comes into the hands of a third party. While the scope of the privilege has been interpreted by this Court on numerous prior occasions, the applicability of the statute in this precise context has not been tested before. Indeed, it has been over eighty years since this Court last encountered a question involving the admissibility, through a third person, of a privileged marital communication.

*O'Toole v Ohio German Fire Ins Co,* 159 Mich 187; 123 NW 795 (1909), was a civil suit involving a claim that the plaintiff wife intentionally burned her barn with the purpose of defrauding the defendant insurance company. The particular issue relevant to the instant case was the admissibility of two incriminating letters made by the wife to, and received by, the husband. The letters inadvertently came into the possession of a third party, who in turn indirectly passed the letters on to the defendant insurance company. The trial court allowed the letters to be received into evidence despite plaintiff's claim that they constituted privileged communications. Relying more upon common-law doctrine from other jurisdictions than the language of the statute itself,[7] the Supreme Court affirmed the trial court, holding:

---

[7] The statute then applicable in *O'Toole* provided, "nor shall either, during the marriage or afterwards, without the consent of both, be examined as to any communication made by one to the other during the marriage . . . ." 1897 CL 10213.

And so it has been held, and, we think, correctly, that where the communication, oral or written, has, without collusion or voluntary disclosure, escaped the custody and control of the parties communicating or the custody or control of their agents or representatives, it is not privileged. [*O'Toole, supra,* p 193.][8]

In reviewing other authorities, the *O'Toole* Court noted that "[t]he cases are not numerous; the rulings are not harmonious." *Id.* This observation still holds true today. Two annotations on the general topic of the interception by third parties of privileged marital communications reflect a wide disparity in the case law in other jurisdictions. See *Applicability of marital privilege to written communications between spouses inadvertently obtained by third person,* 32 ALR4th 1177, and *Spouse's betrayal or connivance as extending marital communications privilege to testimony of third person,* 3 ALR4th 1104. To some courts, the mere fact that a marital communication came within the possession or knowledge of a third person is sufficient to render it admissible in evidence. Other courts have held that the admissibility of a third person's testimony concerning a confidential marital communication depends on whether access to the communication was gained with or without the connivance of the spouse. Yet other courts have held that confidential marital communications are absolutely privileged and never admissi-

---

[8] See also *People v Dunnigan,* 163 Mich 349; 128 NW 180 (1910); cf., *People v Salisbury,* 218 Mich 529; 188 NW 340 (1922) (in a prosecution for attempted rape, the action of the prosecutor in calling the defendant's attention to a paper containing a statement made by his wife and asking him if he did not make the admissions contained in it to her was error under the privilege statute, because the prosecutor's action was an attempt to get before the jury in an indirect way testimony made incompetent by the statute); *People v Bowen,* 165 Mich 231; 130 NW 706 (1911).

ble, no matter how obtained. See annotations, *id.,* and cases cited therein.

Two cases from other jurisdictions have addressed the unusual situation presented in the instant case. In *United States v Burton,* 631 F2d 280 (CA 4, 1980), the defendant contended on appeal that it was improper for the court, in determining the appropriate sentence, to consider a presentence report containing alleged incriminating privileged marital communications. The appellate court found the defendant's contentions to be without merit:

> No marital privilege "prevents the government from enlisting one spouse to give information concerning the other or to aid in the other's apprehension. It is only the spouse's testimony in the courtroom that is prohibited." *Trammel v United States* [445 US 40, 52, n 12; 100 S Ct 906; 63 L Ed 2d 186 (1980)].
>
> The purpose of a probation report, which is not made available to the court until after conviction, is to give the sentencing judge the fullest possible information concerning the defendant's life and characteristics so that he may be able to impose an appropriate sentence. See *Williams v New York* [337 US 241, 250; 69 S Ct 1079; 93 L Ed 1337; 18 USC 3577 (1949)]. There was nothing unusual or improper in the probation officer interviewing defendant's wife, and in obtaining from her pertinent information concerning the defendant's background, character, and conduct, and in including in the probation report the information supplied by defendant's wife to the government agents. In so doing, there was no violation of any privileged marital communication. The court was clearly entitled to consider the presentence report, including such information, in its determination of an appropriate sentence. [*Burton, supra,* pp 281-282.]

In *State v Minor,* 188 Neb 23; 195 NW2d 155

(1972), the court held that a judge at the time of sentencing could consider hearsay statements of the defendant's wife that were in the presentence report. Noting that the modern trend is to restrict or abolish the marital privilege, the court stated:

> We construe a wife's incompetency in criminal proceedings against her husband to be limited to testimonial utterances. She is competent to supply information for a presentence report.
>
> In *State v Rose,* 183 Neb 809 [811], 164 NW2d 646 [1969], we said: "It is a long accepted practice in this state that before sentencing a defendant after conviction a trial judge has a broad discretion in the source and type of evidence he may use to assist him in determining the kind and extent of punishment to be imposed within the limits fixed by statute. . . . A presentence investigation has nothing to do with the issue of guilt. The rules governing due process with respect to the admissibility of evidence are not the same in a presentence hearing as in a trial in which guilt or innocence is the issue. The latitude allowing a sentencing judge at a presentence hearing to determine the nature and length of punishment, other than in recidivist cases, is almost without limitation as long as it is relevant to the issue." [*Minor, supra,* p 27.]

Our determination in the instant case, however, ultimately turns upon an interpretation of Michigan law. While the statutory language governing the marital communications privilege has not undergone significant substantive changes in the eighty years since *O'Toole* was decided, society certainly has, accompanied by an increasing recognition that the broad cloak of the marital privilege is no longer justified under certain circumstances. The undisputed modern trend is toward a restrictive, rather than expansive, interpretation of the

privilege. As Justice BOYLE noted in her dissenting opinion in *People v Hamacher, supra,* pp 186-187,

> The confidential communications privilege is said to inspire marital confidences. McCormick, Evidence (3d ed), § 86, p 201. Over time, case law has blurred the justifications, and it is sometimes observed that the validity of both privileges rests on the utilitarian ground of promoting marital harmony. . . .
>
> Criticism of both marital privileges centers on the fact that they conflict with the jurisprudential objective of advancing the truth-finding function. As Professor McCormick observes, "while the danger of injustice from suppression of relevant proof is clear and certain, the probable benefits of the rule of privilege in encouraging marital confidences and wedded harmony is at best doubtful and marginal." McCormick, *supra,* § 86, p 202.

The principle that privileges should be narrowly defined and the exceptions to them broadly construed is not new. The *O'Toole* Court qualified its holding with the admonition:

> The privilege is in derogation of the general rule that all persons may be compelled to testify concerning facts inquired about in courts of justice. It should be made effective, but ought not to be extended by the courts to cases where there has been no injury to the relation of the parties by the betrayal of the confidence reposed. [*Id.,* p 193.]

More recently, in *People v Love, supra,* pp 700, 701 (opinion of CAVANAGH, J.), this Court reiterated the fundamental rule:

> "Testimonial exclusionary rules and privileges contravene the fundamental principle that 'the public . . . has a right to every man's evidence.'

As such, they must be strictly construed and accepted 'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.' " [Quoting from *Trammel v United States,* 445 US 40, 50; 100 S Ct 906; 63 L Ed 2d 186 (1980) (citations omitted). See also *People v Hamacher, supra,* p 188 (dissenting opinion of BOYLE, J.).]

With these principles in mind and our primary focus on the language used in the Michigan statute, we conclude that MCL 600.2162; MSA 27A.2162, does not apply in the circumstances presented. The statute provides that neither spouse may "be examined" with respect to any communication made by one to the other during the marriage. This phrase, "be examined," connotes a narrow testimonial privilege only—a spouse's privilege against being questioned as a sworn witness about the described communications. In other words, the spouse must testify for the privilege to apply. The introduction of the marital communication through other means is not precluded.

In the instant case, the marital communications privilege is inapplicable because Mary Fisher was not called to testify either at trial or at the evidentiary hearing conducted by Judge McCauley.[9] The three contested statements made by her to the police detective were set forth in an affidavit to obtain a search warrant. Later, the same statements were included in the presentence report. Although the detective testified concerning the statements made to him, which became part of the

---

[9] We are not called upon in this case to decide whether the statutory privilege applies when a spouse testifies at a sentencing hearing.

presentence report, at no time was Mary Fisher examined as a witness against her husband.[10]

Because we hold that the marital communications privilege is a testimonial privilege that is limited to those situations in which a spouse is being "examined" in court proceedings with regard to the communications, the three hearsay statements that in this case were written into the presentence report were properly considered by the sentencing court. MRE 1101(b)(3), which provides that the Rules of Evidence do not apply to sentencing proceedings, certainly contemplates that hearsay that does not fall within the protec-

---

[10] Our interpretation of the statute as creating only a testimonial privilege is supported by the separate opinion of Justice LEVIN in *People v Hamacher, supra,* p 177, who in the context of a different aspect of the marital privilege, stated:

> Section 2162 of the Revised Judicature Act does not purport to bar a spouse from disclosing a confidential communication. Hamacher's wife, without violating § 2162, related the statement she attributed to her husband to social service workers, police officers, the prosecutor, and could have done so to newspaper and other reporters. She could indeed have gone on the nightly news and made a full statement of the confidential communication without violating § 2162. The "secret" would then no longer have been secret and "never again a wholly private matter." Nevertheless, there can be no doubt that despite the wide communication to the world at large of the "secret," Hamacher's wife could not, consistent with § 2162, "be examined" in court with regard to the communication.

Justice LEVIN concluded that the marital privilege statute precludes only *testimony* of the spouse:

> The courts have no basis for declaring that the statutory purpose in 1861 was to protect the secrecy of the communication when the statute itself clearly does not purport to do so. There is no basis for concluding in 1989—over one hundred twenty-five years after enactment—that the legislative purpose in 1861 was other than the literally stated purpose of precluding the spouse from "be[ing] examined" in court. [*Id.,* pp 179-180.]

Justice LEVIN, in his dissenting opinion in the case at bar, now withdraws from his own obiter dictum; we nonetheless find his observations to be cogent under the present circumstances.

tion of an established privilege, may be included in presentence reports.[11] Indeed, it is recognized by Michigan courts that the evidentiary rules governing trial procedure and sentencing are different:

> Historically, separate evidentiary rules have been fashioned for the trial and sentencing procedures. Evidence admitted at trial to determine whether the defendant is guilty of a specific criminal conduct is largely limited by evidentiary rules to first-hand or verifiable testimony directly related to the offense charged. But under Michigan's indeterminate sentencing law, MCL 769.8; MSA 28.1080; the responsibility for setting the limits of sentence between the statutory minimum and maximum rests squarely on the sentencing judge. At the sentencing hearing, after the issue of guilt has been decided, full information regarding the defendant's character, background, and criminal record have generally been deemed admissible under concepts of individualizing punishment. The presentence report, mandatory for felony cases in Michigan since 1931, allows the court to make an informed judgment as to possibilities for rehabilitation, and to effectively utilize sentencing alternatives. [*People v Lee*, 391 Mich 618, 634-635; 218 NW2d 655 (1974). See also *Williams v New York, supra; People v Potrafka,* 140 Mich App 749, 751; 366 NW2d 35 (1985); *People v Burton,* 44 Mich App 732; 205 NW2d 873 (1973), lv den 389 Mich 795 (1973).]

We realize that our holding today effectively

---

[11] [T]here are no formal limitations on the contents of the presentence report, but there are limitations dictated by due process.

\* \* \*

We do not believe it would be a wise policy to restrict the sentencing judge to the information admissible in open court alone. [*People v Lee, supra,* pp 636, 639. See also *People v Books,* 95 Mich App 500, 503-504; 291 NW2d 94 (1980).]

overrules *O'Toole* and other cited cases to the extent that they can be read as recognizing a broader privilege. However, our ruling by no means represents an abrogation of the marital communication privilege. The dissent of the Chief Justice asserts that our holding would eliminate the statute's consent requirement, and he refers for an example to a spouse's divulgence of confidential marital communications in the course of intense police interrogation. According to the dissent, "[e]ven if the spouse refuses to testify in court regarding the communications, the police can testify because the majority holds that if the spouse does not testify, the privilege does not apply." (CAVANAGH, C.J., *post,* p 589.) Of course, the flaw in this reasoning is that use of such third-party testimony in a nonsentencing setting would be governed by the rule against hearsay set forth in MRE 802. See, e.g., *People v Williams,* 181 Mich App 551; 450 NW2d 85 (1989); *People v Burton,* 177 Mich App 358, 362; 441 NW2d 87 (1989); *People v DeWitt,* 173 Mich App 261; 433 NW2d 325 (1988).

Moreover, as Professor McCormick has posited,

> The argument traditionally advanced in support of the marital communications privilege is that the privilege is needed to encourage marital confidences, which confidences in turn promote harmony between husband and wife. This argument . . . rests upon certain assumptions concerning the knowledge and psychology of married persons. Thus it must be assumed that spouses will know of the privilege and take its protection into account in determining to make marital confidences, or at least, which is not the same thing, that they would come to know of the absence of the privilege if it were withdrawn and be, as a result, less confiding than at present.
>
> In the absence of any empirical validation, these

propositions have appeared highly suspect to many, though not all, commentators. Thus the most convincing answer to the argument of policy appears to be that the contingency of courtroom disclosure would almost never (even if the privilege did not exist) be in the minds of the parties in considering how far they should go in their secret conversations. What encourages them to fullest frankness is not the assurance of courtroom privilege, but the trust they place in the loyalty and discretion of each other. If the secrets are not told outside the courtroom there will be little danger of their being elicited in court. In the lives of most people appearance in court as a party or a witness is an exceedingly rare and unusual event, and the anticipation of it is not one of those factors which materially influence in daily life the degree of fullness of marital disclosures. [1 McCormick, Evidence (4th ed), § 86, pp 309-310.]

Of course, it is the prerogative of the Legislature, if it chooses, to expand the marital communications privilege beyond its testimonial nature. However, in the absence of such direction, we follow the mandate of strict construction, particularly where, as here, ascertainment of the truth transcends the need to exclude relevant evidence. Accordingly, we conclude that the decision of the Court of Appeals on this issue must be reversed.

We now consider whether Judge McCauley used the appropriate guidelines when he sentenced defendant.

III

Administrative Order No. 1988-4 requires the circuit courts to apply the second edition of the sentencing guidelines when sentencing a defendant after October 1, 1988:

The Sentencing Guidelines Advisory Committee

is authorized to issue the second edition of the sentencing guidelines, to be effective October 1, 1988. Until further order of the Court, every judge of the circuit court and of the Recorder's Court for the City of Detroit must thereafter use the second edition of the sentencing guidelines when imposing a sentence for an offense that is included in the guidelines.

Defendant contends that the retroactive application of the revised sentencing guidelines under the present circumstances was a violation of the proscription against ex post facto laws in the state and federal constitutions,[12] his constitutional right to due process,[13] and his right to appeal.[14] Defendant reasons that since he was resentenced twice

---

[12] Const 1963, art 1, § 10, provides:

No bill of attainder, ex post facto law or law impairing the obligation of contract shall be enacted.

US Const, art I, § 9, cl 3 provides:

No Bill of Attainder or ex post facto Law shall be passed.

US Const, art I, § 10, cl 1 provides:

No State shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility.

[13] Const 1963, art 1, § 17, provides, in pertinent part:

No person shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property, without due process of law.

[14] Const 1963, art 1, § 20 provides, in pertinent part:

In every criminal prosecution, the accused shall have the right . . . to have an appeal as a matter of right; and as provided by law, when the trial court so orders, to have such reasonable assistance as may be necessary to perfect and prosecute an appeal.

because of court error, it is unfair to subject him
to a harsher recommended sentence. He explains
that the revised guidelines were not applicable
when he was first sentenced. Under the original
guidelines, the recommended minimum sentence
range was seven to sixteen years; however, under
the new guidelines, the recommended minimum
sentence range is ten to twenty-five years.

Defendant concedes that our decision in *People v
Potts,* 436 Mich 295; 461 NW2d 647 (1990), which
was decided during the course of defendant's ap-
peals, obviates the ex post facto issue. In *Potts,* the
defendant challenged application of the revised
sentencing guidelines to her May 1988 offense.
Noting that use of the revised edition is tied to the
date that sentences are imposed (rather than the
date that offenses are committed) and that the
Michigan sentencing guidelines do not establish a
presumptive sentencing range,[15] this Court held
that constitutional ex post facto requirements
were not violated:

> Sentencing judges in this state are required by
> this Court's administrative orders to consider the
> minimum range recommended by the guidelines,
> but are not bound by it. As the Court of Appeals
> observed, the guidelines are but "a tool to assist
> the sentencing judge in the exercise of discretion."
> 181 Mich App 313 [448 NW2d 820 (1989)].
>
> It cannot be said, therefore, that the Michigan
> guidelines convey substantive rights. Since there
> are no presumptive sentences, the guidelines as
> revised did not increase the punishment for the
> defendant's crime. Neither before nor after the
> revisions did the guidelines limit the discretion

---

[15] Judges are permitted to depart from the sentencing guide-
lines, and are required merely to explain their reasons for
doing so. *Further, all sentences are subject to appellate review.*
[*Id.,* p 302. Emphasis added.]

afforded the sentencing judge in this case by the indeterminate sentencing act. MCL 769.8; MSA 28.1080. There is no violation of the ex post facto provision where the enactment at issue alters modes of procedure rather than substantial personal rights. [*Potts, supra,* p 303.]

Given our conclusion in *Potts,* that the revised guidelines convey no substantive rights, it logically follows that application of the revised nonbinding sentencing guidelines to a defendant who has appealed his sentence neither chills his right to appeal nor infringes upon his right to due process. The revised guidelines did not increase defendant's punishment in this case; the only change was in what was deemed appropriate punishment pursuant to the guidelines. Moreover, the revisions did not limit the discretion afforded the sentencing judge. *Id.,* p 303.

Practically speaking, this defendant has no cause to complain. His first two sentences, being forty to sixty years, exceeded the original guidelines recommendation. The twenty-five-year minimum imposed when he was sentenced a third time under the revised guidelines is actually fifteen years less than the forty-year minimum sentence originally imposed.[16] Furthermore, the twenty-five-year minimum sentence is within the revised guidelines and is therefore presumptively valid. *People v Broden,* 428 Mich 343, 354-355; 408 NW2d 789 (1987). We find no basis in the record to conclude that the defendant should be resentenced yet another time.[17]

[16] At the final resentencing, the trial court stated on the record that if an appellate court later determined that the first edition of the guidelines was applicable, he nevertheless found the seven to sixteen year recommendation inadequate in light of the aggravating circumstances of the case and, accordingly, he would depart from that recommendation in any event.

[17] We likewise find without merit defendant's claim that the last

IV

For the reasons set forth, we reverse the decision of the Court of Appeals.

BRICKLEY, BOYLE, RILEY, and MALLETT, JJ., concurred with GRIFFIN, J.

CAVANAGH, C.J. (*concurring in part and dissenting in part*). I concur with the majority disposition of the sentencing guideline issue; this Court did not confer a substantive right upon a defendant to receive a sentence under a particular guideline. I write separately, however, because I cannot agree with the majority's result-oriented disposition of the marital communication privilege[1] issue.

In my view, if the police officer's written testimony at sentencing concerned confidential marital communications, then the privilege applies whether or not Ms. Fisher testified. If the marital communication privilege applies, the police officer's testimony also should be barred. See *People v Salisbury*, 218 Mich 529, 535; 188 NW 340 (1922) ("cross-examination is restricted as to other witnesses when the answers would reveal confidential communications, the divulgence of which is prohibited by statute"). It is irrelevant that hearsay is admissible at sentencing pursuant to MRE 1101(b)(3) because only "hearsay that does not fall within the protection of an established privilege, may be

sentencing judge, in referring to defendant's first statement to Mary Fisher ("[t]ell him to come in here so I can stick him a couple of times," see *ante,* p 566) as "almost premeditated talk," erroneously sentenced him on a charge for which he was acquitted—first-degree murder. The court also described the crime as "intentional," "gross," and "not an accidental matter." All these descriptions fall within the accepted definition of second-degree murder, *People v Dykhouse*, 418 Mich 488, 508-509; 345 NW2d 150 (1984), and by no means indicate that the court improperly considered the offense for which he was sentencing the defendant to be first-degree murder.

[1] MCL 600.2162; MSA 27A.2162.

included in presentence reports."[2] GRIFFIN, J.,
*ante,* pp 576-577.

I

This Court has interpreted the privilege statute
to encompass two distinct privileges. The first, the
spousal privilege, prevents a defendant's spouse
from testifying in court without the defendant's
consent. The second, the marital communication
privilege, prevents a defendant and the defen-
dant's spouse[3] from disclosing confidential marital
communications at judicial proceedings, unless
both spouses consent. *People v Hamacher,* 432
Mich 157, 161; 438 NW2d 43 (1989). This case
involves the marital communication privilege.

The marital communication privilege is "a rule
of public policy; the privilege being the privilege of
the spouse making the communication, *the lips of
both being sealed, unless both, otherwise, person-
ally consent." Sweikhart v Hanrahan,* 184 Mich
201, 207; 150 NW 833 (1915). (Emphasis added.) It
has been said that " '[t]he exclusion of such com-
munications when made in confidence between
persons occupying the intimate relation of hus-
band and wife is predicated on the necessity of
fostering such relation and the greater injury

---

[2] I agree with the principle that evidence not admissible at trial
generally is admissible during sentencing; however, MRE 1101(b)(3)
bars privileged information during sentencing. Consistent application
of the privilege rule indicates that if the privilege bars the communi-
cation at trial, then it also bars the communication at sentencing.

[3] The defendant was married during the trial, but divorced at the
time of sentencing. Nonetheless, we reject the prosecutor's argument
that the communication is admissible because the marriage could not
be saved. The marital communication privilege " 'contains no excep-
tion to the privilege regarding communications between a husband
and wife where the husband and wife are separated or are in the
process of obtaining a divorce.' " *People v Hamacher,* 432 Mich 157,
163; 438 NW2d 43 (1989). Testimony regarding the communication is
not admissible in court "if it was made during the marriage." *People
v Vermeulen,* 432 Mich 32, 37-38; 438 NW2d 36 (1989).

likely to result from permitting their disclosure than the benefit to be gained thereby.' " *People v Ignofo,* 315 Mich 626, 638; 24 NW2d 514 (1946) (quoting *Salisbury* at 532).

The marital communication privilege also applies at sentence proceedings. Although the statute itself neither limits nor expressly provides for application of the privilege rule to sentencing, *MRE 1101(b)(3) certainly does:*

> (b) Rules Inapplicable. The rules *other than those with respect to privileges* do not apply in the following situations and proceedings:
>
> *    *    *
>
> (3) Miscellaneous Proceedings. Proceedings for . . . sentencing . . . . [Emphasis added.]

II

The problem raised here is that Ms. Fisher disclosed to a police officer confidential marital communications made by her husband, the defendant. The police officer then included the statements in Mr. Fisher's presentence report, which was considered at sentencing. The prosecutor argues that such use was appropriate because hearsay is admissible at sentencing. MRE 1101(b)(3). If the statements are barred by the marital communication privilege, however, the police officer's testimony also should be inadmissible.[4]

The majority dismisses this problem by holding,

---

[4] It is obvious that neither the Legislature nor the court can prevent either spouse from breaching confidentiality. Nonetheless, the Legislature and the courts have developed the marital communication privilege and must have had a reason, such as, preventing the information from being disclosed in court. The statute would be meaningless if the wife could disclose the communication to a third party, and then the third party testifies at judicial proceedings regarding the communication.

"[b]ecause . . . the marital communications privilege is a testimonial privilege that is limited to those situations in which a spouse is being 'examined' in court proceedings with regard to the communications, the three hearsay statements that in this case were written[5] into the presentence report were properly considered by the sentencing court." GRIFFIN, J., *ante*, p 576. In effect, the majority allows circumvention of the marital communication privilege and MRE 1101(b)(3),[6] by allowing evidence indirectly that is prohibited directly, a ploy this Court long has forbidden.[7]

Aside from erroneously concluding that the spouse must testify for the privilege to apply, the majority does recognize that MRE 1101(b)(3) "certainly contemplates that hearsay that does not fall within the protection of an established privilege, may be included in presentence reports." GRIFFIN, J., *ante*, pp 576-577. Logically, the inverse should

---

[5] The majority states that the statements were written into the presentence report. There is no distinction, in this case, between the police verbally testifying and the police writing the statements in the report.

[6] This Court promulgated MRE 1101(b)(3) in the order of January 5, 1978. This Court still has "not undertaken a review of the statutory privileges . . . since the promulgation of the Michigan Rules of Evidence." *Vermeulen*, n 3 *supra* at 37. MRE 1101(b)(3) demonstrates that when the Court adopted the rule, it had in mind ensuring that third parties, who did not witness the making of statements were not able to testify regarding confidential marital communications. Despite the fact that this Court promulgated MRE 1101(b)(3), the majority looks to other jurisdictions to support ignoring the rule's clear mandate that privilege rules apply at sentencing. See GRIFFIN, J., *ante*, pp 572-573.

[7] The prosecutor may not attempt to admit evidence that otherwise is inadmissible. See, e.g., *People v Ignofo, supra* at 638-641; *People v Salisbury, supra.* In *Salisbury,* this Court stated that the "course pursued by the prosecuting attorney to which objection was made brought clearly before the jury the fact that defendant's wife had made a statement in writing to him, in which she had said that defendant made the admissions which he as a witness denied. Counsel could not and did not seek to call the wife as a witness. In this indirect way he placed before the jury the fact, unsworn to, that such damaging admissions had been made by the defendant to her. That prejudice resulted therefrom cannot be doubted." *Id.* at 533.

also be true. Hearsay that falls within the protection of an established privilege may not be included in presentence reports.

The hearsay statements here are the confidential marital communications defendant made to his wife. If the statements are protected by the marital communication privilege then both spouses are barred from testifying regarding the statements. To give meaningful effect to that requirement, it must follow that "cross-examination is restricted as to other witnesses when the answers would reveal confidential communications, the divulgence of which is prohibited by statute." *Salisbury* at 535.[8] Consequently, the police officer's testimony here would be inadmissible. The majority attempts to elude this prohibition by holding that the privilege does not apply because the spouse was not called to the stand or examined about confidential marital communications.

### III

I suggest there is no rational or legal basis for the majority's conclusion that the defendant's spouse must be called to testify for the marital communication privilege to apply.[9] First, putting

---

[8] The *Salisbury* Court held that a defendant cannot be compelled to testify about confidential communications without the spouse's consent even though the defendant volunteered to testify regarding other matters. The Court explained that the confidential nature of the communication barred use of the communication during judicial proceedings.

[9] The majority states,

In other words, the spouse must testify for the privilege to apply. The introduction of the marital communication through other means is not precluded.

In the instant case, the marital communications privilege is inapplicable because Mary Fisher was not called to testify either at trial or at the evidentiary hearing conducted by Judge McCauley. [*Ante,* p 575.]

the spouse on the stand is not a requirement for a communication to fall within the protection of the marital communication privilege.[10] Second, and more importantly, under the spousal privilege the defendant's spouse cannot take the stand unless the defendant first consents. Under the marital communication privilege, both spouses may testify, but both must consent before either can be examined regarding confidential marital communications. Therefore, the prosecutor "could not call defendant's" spouse to the stand because he was prohibited by statute. *Ignofo* at 640. Consequently, the majority's analysis is seriously flawed.[11]

Even if the defendant consented to his spouse taking the stand, "[t]here is no question but that the wife of defendant could not be asked to disclose such communications," unless the marital communication privilege also is waived. *Id.* at 639 (quoting, *Salisbury* at 535). The distinction between the consent required to waive each privilege further demonstrates that the focus of the marital communication privilege is on prohibiting disclosure of confidential marital communications in court, absent consent.[12]

---

Furthermore, the majority stresses that "at no time was Mary Fisher examined as a witness against her husband." *Ante* at 576.

[10] To invoke the marital communication privilege, the communication must be made during the marriage, *Hamacher* at 162, be intended to be confidential, and not be made in the presence of a third party. *People v Rosa,* 268 Mich 462, 464; 256 NW 483 (1934).

[11] The spouse would not need to testify at sentencing because the majority allows the police to take her testimony out of court and use it at sentencing.

[12] For example, under the spousal privilege an ex-spouse can testify without defendant's consent and a spouse can testify with defendant's consent. Nonetheless, the marital communication privilege in both situations allows the defendant to bar testimony regarding confidential marital communications. Similarly, the spouse can refuse to testify even if the defendant wants the spouse to disclose the confidential marital communications in court. The spouse also can prevent the defendant from disclosing confidential marital communications by refusing to consent. *Salisbury* at 536-537.

The majority's conclusion eliminates the right of both spouses to consent before either may disclose confidential marital communications. If confidential marital communications are admissible because neither spouse testifies, but one spouse discloses the statements to a police officer, who then testifies regarding those statements, then the consent requirement would be pointless. That result is contrary to this Court's responsibility to interpret statutes to avoid rendering any provision meaningless. See *Girard v Wagenmaker,* 437 Mich 231, 238; 470 NW2d 372 (1991) (the Court "must still give the statute a valid and reasonable construction that will reconcile any inconsistencies and give effect to all its parts").[13]

Consider the implications of the majority's rule. The police interrogate a defendant's spouse, who, under the heat of the lights and the pressure of the officers, discloses otherwise confidential marital communications. Even if the spouse refuses to testify in court regarding the communications, the police can testify because the majority holds that if the spouse does not testify, the privilege does not apply.

Besides eroding the consent requirement, the majority rule renders the marital communication privilege virtually nonexistent at sentencing, thus overruling MRE 1101(b)(3). If the privilege does not apply because the spouse does not take the stand, then confidential marital communications could be disclosed to third persons who may testify at sentencing despite the otherwise applicability of the privilege. In order for the privilege to apply after today, the defendant would have to call the

---

[13] The majority decision also renders MRE 1101(b)(3) meaningless. Consistent with principles of statutory construction, this Court should interpret the Michigan Rules of Evidence, which it adopted, to avoid rendering any provision meaningless.

spouse to the stand, since it is doubtful the pros-
ecutor will. In effect, defendant is forced to consent
to his spouse taking the stand and being examined
regarding confidential marital communications. It
seems odd that the defendant would have to con-
sent, and then moments later object to the same
questions being asked in order to invoke the privi-
lege. Such a rule is imprudent because it renders
the marital communication privilege unworkable,
and it impedes the privilege's purpose. Although
some of my colleagues have advocated eliminating
the marital communication privilege altogether,
until it is eliminated, this Court must continue to
interpret and apply the privilege in a meaningful
manner as it is written. This is to say, testimony
regarding confidential marital communications is
not to be admitted in court, absent consent or an
applicable exception.

IV

The cases on which the majority relies really do
not bear close scrutiny. The marital communica-
tion privilege was not an issue in *People v Wil-
liams,* 181 Mich App 551; 450 NW2d 85 (1989),
which only involved the spousal privilege. Simi-
larly, *People v Burton,* 177 Mich App 358; 441
NW2d 87 (1989), does not involve the marital
communication privilege, and the statements at
issue in *People v DeWitt,* 173 Mich App 261; 433
NW2d 325 (1988), were not confidential marital
communications.[14]

*Williams,* nonetheless, warrants further explica-

[14] It should be pointed out that *State v Minor,* 188 Neb 23; 195
NW2d 155 (1972), does not involve the marital communication privi-
lege, and, apparently, Nebraska did not have a rule similar to MRE
1101(b)(3) at the time the case was decided. For the same reason, the
majority's reliance on *Trammel v United States,* 445 US 40; 100 S Ct
906; 63 L Ed 2d 186 (1980), is mistaken.

tion. In *Williams,* the defendant allegedly shot her
tenant. The defendant's husband immediately
called for emergency assistance and reported that
a " 'woman just shot her tenant.' " The defendant's
husband was prohibited from testifying in court
against[15] the defendant without the defendant's
consent. The *Williams* Court concluded, however,
that the statement to the 911 operator itself is not
protected by the spousal privilege; therefore, the
911 operator could testify regarding the statement
"if indeed the court determined that a hearsay
exception applied . . . ." *Id.* at 554. I agree with
that holding because the spousal privilege bars the
spouse from testifying, but does not purport to
preclude any specific category of testimony. If the
defendant had consented to her husband taking
the stand, he could have testified about his state-
ment to the 911 operator, if such testimony other-
wise is admissible.

If the husband's statement was a confidential
marital communication, however, the outcome in
*Williams* would be different. For example, assume
that the defendant consented to her husband tak-
ing the stand, and, while testifying, the prosecutor
attempted to question the husband regarding confi-
dential marital communications. Because both par-
ties must consent to either spouse being examined
in court regarding confidential marital communi-
cations, either the husband could refuse to answer
the question, or the defendant could prevent him
from answering, by invoking the marital communi-
cation privilege. Thus, the marital communication
privilege does not prevent the spouse from taking
the stand, but does specifically prohibit certain

---

[15] Interestingly, the statute does not differentiate between admitting
favorable or unfavorable testimony. Even if the testimony was favora-
ble, both spouses must consent before either can be examined regard-
ing a confidential marital communication or "communications."

testimony from being disclosed without both spouses' consent. Therefore, the marital communication privilege protects the statement itself. Consequently, the third party to whom the statement later is disclosed also should be prohibited from disclosing the statement in court. Holding otherwise thwarts the purpose of the privilege.

In holding that the marital communication privilege is testimonial only, the majority also relies on Justice Levin's separate opinion in *Hamacher,* in which he explained:

> Hamacher's wife, without violating § 2162, related the statement she attributed to her husband to social service workers, police officers, the prosecutor, and could have done so to newspaper and other reporters. She could indeed have gone on the nightly news and made a full statement of the confidential communication without violating § 2162. The "secret" would then no longer have been secret and "never again a wholly private matter." Nevertheless, *there can be no doubt that despite the wide communication to the world at large of the "secret," Hamacher's wife could not, consistent with § 2162, "be examined" in court with regard to the communication.* [432 Mich 177. Emphasis added.]

The majority claims that Justice Levin concluded that the marital privilege statute only precludes *testimony* of the spouse. Although Justice Levin did say the purpose of the statute was to preclude "the spouse from 'be[ing] examined' in court," I do not read my colleague's opinion so narrowly. *Id.* at 180.

Justice Levin merely was offering support for this Court's decision in *Breisenmeister v Knights of Pythias,* 81 Mich 525; 45 NW 977 (1890), which involved the patient-physician communication

privilege.[16] In *Breisenmeister,* this Court interpreted the patient-physician privilege to "include[ ] both the security against publication, and the right to control the introduction in evidence, of such information or knowledge communicated to or possessed by the physician." *Id.* at 535. The Court stressed that the "latter right exists although the former has ceased to be of any benefit." *Id.* Thus, Justice LEVIN merely was reiterating the principle that even if the secret no longer exists, the privilege does.[17]

I think it is clear that the marital communication privilege, precludes more than just the spouse's testimony. Inherent in Justice LEVIN's conclusion is that any third party to whom the spouse discloses the confidential marital communication is prohibited from testifying in court regarding the communication. If others could testify it would have been unnecessary to argue that the privilege still exists, because the party could have brought in the communication through another witness. The majority ignores that this Court already has explained this principle:

The public may know; but shall the jury be

---

[16] MCL 600.2157; MSA 27A.2157. The privilege statute provides:

[A] person duly authorized to practice medicine or surgery shall not disclose any information that the person has acquired in attending a patient in a professional character . . . .

In *Scripps v Foster,* 41 Mich 742, 748; 3 NW 216 (1879), this Court held that the "object of the statute . . . is to prevent the abuse of the confidential relation existing between the physician and his patient and is for the protection of the latter."

[17] Justice LEVIN was contrasting *McKinney v Grand Street P P & F R Co,* 104 NY 352; 10 NE 544 (1887), which held that once the information was communicated at trial and no objection was raised, there was no reason to enforce the privilege statute, because the information was no longer a secret. Justice LEVIN stated that the legislative intent was not to protect the secret, however. The legislative intent was to invoke the protection even if the communication no longer was secret.

permitted to receive and weigh testimony derived from a source which the law has put the seal of silence upon, unless released by the party who alone has the right to say whether that particular witness shall be the medium of conveying such knowledge to the jury? For instance, the party may have disclosed to a third person all that he has to his physician. Now, while his admissions may be proved in a proper manner by such third person, they cannot be proved by the physician against the objection of the party. The privilege conferred is that the physician shall not *disclose or testify* to those matters which the statute inhibits without the consent of the party to whom the privilege is extended . . . . [*Id.* at 535-536. Emphasis added.]

Significantly, this Court used the terms "disclose" and "testify." A logical interpretation is that the Court said the physician may not "testify" or "disclose" the communication to ensure that the communication is not used in court by anyone to whom the physician discloses the communication.

Justice BOYLE's dissent in *Hamacher* also supports not allowing disclosure of confidential marital communications in court. Although Justice BOYLE disagreed with the privilege altogether, she stated that with "the passage of 1861 PA 125, Michigan codified the rule of conditional competency or spousal bar and enacted a separate *privilege protecting from disclosure at a judicial proceeding* all confidential communications between spouses made during the marriage." *Hamacher* at 185. (Emphasis added.)

Justice BOYLE explained that the two privileges involved "the right to bar the spouse from testifying and the right to prevent the spouse from revealing confidential communications." *Id.* at 185-186. Recognizing that the spouse may testify under the marital communication privilege but still not

"reveal" the communication indicates that the marital communication privilege involves something more than prohibiting spouses from testifying. Obviously, the court cannot prevent a spouse from telling the whole world, but the court can prevent the communication from being revealed at any time during judicial proceedings.

V

I would hold that because the privilege bars testimony regarding confidential marital communications at trial, whether or not the spouse testifies, and because privilege rules apply at sentencing, the same testimony is barred at sentencing. Once the communication falls within the marital communication privilege, it remains privileged and may not be admitted through a third party.[18] I, therefore, agree with the Court of Appeals that the marital communication privilege bars the disclosure by the police officer at sentencing.

Finally, I concur with the majority's decision to vacate the Court of Appeals order for resentencing under the first edition of the sentencing guidelines.

The following opinion was filed with the Clerk of the Supreme Court on June 30, 1993, after the release of the opinion of the Court on June 29, 1993—REPORTER.

LEVIN, J. (*dissenting*). Richard Erick Fisher was convicted of second-degree murder on evidence tending to show that he stabbed William Tappert with a hunting knife at the home of Mary Fisher, his estranged wife. At a sentencing hearing, a police detective, who interviewed Mary Fisher at

---

[18] This is not an expansion of the current privilege, but merely a reasonable interpretation that salvages some meaning for having the privilege.

the crime scene, testified that she told the detective that Fisher had asked her "to tell the police that Tappert had fallen into the knife." That statement is also recited in the presentence report.

The Court of Appeals concluded that the detective's testimony and the recital in the presentence report were evidence that Fisher had asked his estranged wife to lie to the police, and was barred by the marital communications privilege.[1]

The majority concludes that the marital communications privilege does not bar the introduction in evidence of the testimony of the detective or of a document, the presentence report, reporting what Fisher is said to have said to his wife because the privilege is limited to sworn testimony by a spouse in court. No decision of this Court supports this construction of this statutory privilege. What little authority there is in this jurisdiction indicates that the privilege is not limited to spousal testimony in court. The authorities in other jurisdictions overwhelmingly support the view that the privilege bars the introduction in evidence of marital communications through the testimony of a person who spoke to one of the spouses or in the form of a writing containing statements from one spouse to the other obtained through connivance or betrayal by the spouse from whom the writing was obtained.

I

Fisher was sentenced to serve a term of forty to sixty years in prison. On remand from the Court of Appeals, he was sentenced to serve a term of twenty-five to fifty years. Before resentencing, the

---

[1] 190 Mich App 598; 476 NW2d 762 (1991). See n 4 for the text of this statutory privilege.

judge conducted a sentencing hearing during the course of which three statements were admitted in evidence, over objection, through the testimony of the police detective. These statements were also recited in the presentence report.

The Court of Appeals did not find it necessary to consider whether the first of the three statements[2] was privileged because the sentencing judge said he would not consider the first statement. Nor was it necessary for the Court of Appeals to consider the second statement because it was made in the presence of a third person, and thus was not a confidential communication protected by the privilege.

In imposing sentence on Fisher, the judge said that he considered the third statement, wherein Mary Fisher reported that Fisher had asked her to tell the police that Tappert had fallen into the knife.

The Court of Appeals concluded that the third statement, "which was a request by defendant to his estranged wife asking her to lie to the police, was barred by the confidential communications privilege. An element of confidentiality is implicit in a request to tell a lie."[3]

---

[2] The challenged statements made by defendant's estranged wife, as reported in the presentence report, are as follows:

"[1] [Defendant]: 'Is your fuckin[g] boyfriend here? Tell him to come in here so I can stick him a couple of times.'

"[2] She started to cry and asked [defendant], 'Did you stab him?' to which he replied, 'Fuck yes I stuck him.'

"[3] Mary followed [defendant] outside of the house and [defendant] told her to tell the police that Tappert had fallen into the knife."

We note initially that defendant concedes that the second statement was not a privileged communication because of the presence of a third party (Ms. Fisher's son) when the communication was made. [*Id.*, p 601.]

[3] *Id.*, p 603.

## II

The marital communication privilege is statutory. It bars either spouse, during or after the marriage, from being "examined," without the consent of both, concerning any communication made by one to the other during the marriage.[4]

In *People v Bowen,* 165 Mich 231, 237; 130 NW 706 (1911), this Court said that "it was not error to refuse to permit [the defendant in a criminal case] to testify to the contents of letters sent by [his wife] to him, or given or shown to him by her, whether written by her or others."

Earlier, this Court had approved the admission in evidence of letters from one spouse to the other that apparently had been misplaced and obtained by the defendant insurance company "without collusion or voluntary disclosure" by the spouse. *O'Toole v Ohio German Fire Ins Co,* 159 Mich 187, 193; 123 NW 795 (1909).[5] The clear meaning, consistent with substantial authority in other jurisdictions[6] cited by this Court in *O'Toole,* is that the letters would not have been admissible if the spouse had colluded in their transmittal to the insurance company.

In *People v Dunnigan,* 163 Mich 349; 128 NW 180 (1910), the accused delivered a letter addressed to his wife to an acquaintance who promised to deliver it to the wife, but who delivered it to the sheriff. In holding that the letter was admissible,

---

[4] The statute provides:

[N]or shall either, during the marriage or afterwards, without the consent of both, be examined as to any communication made by one to the other during the marriage . . . . [MCL 600.2162; MSA 27A.2162.]

[5] This is the first Michigan case in point we found since enactment of the marital communications privilege, 1861 PA 125.

[6] See 1 McCormick, Evidence (4th ed), § 82, p 303.

this Court quoted with approval the following statement from *O'Toole:*

"And so it has been held, and, we think, correctly, that where the communication, oral or written, has, *without collusion or voluntary disclosure,* escaped the custody and control of the parties communicating, or the custody and control of their agents or representatives, it is not privileged." [*Id.* at 351. Emphasis added.]

Twelve years later, in *People v Salisbury,* 218 Mich 529, 533; 188 NW 340 (1922), the defendant had been convicted of assault with intent to commit rape. He was cross-examined at length concerning his denials of "admissions" claimed to have been made by him to his wife. He was asked to read "a statement in writing [from his wife] to him, in which she had said that defendant made the admissions which he as a witness denied." The Court said that the prosecutor "could not and did not seek to call the wife as a witness," and that it was error requiring reversal to place before the jury indirectly "that such damaging admissions had been made by the defendant to her."

*Salisbury* thus stands for the proposition that it is violative of the marital communications privilege to place before the trier of fact, a wife's statements concerning statements made to her, orally or in writing, by her husband. The wife in *Salisbury* was not called or sworn as a witness. Nevertheless, this Court said that what was done was violative of the marital communications privilege, and concluded that "[f]or the error thus committed, the verdict must be set aside and a new trial granted."

The Legislature has not spoken in the seventy years since *Salisbury* was decided. It is not appropriate at this late date, over eighty years after

*O'Toole* and *Bowen* were decided, to revise the construction, consistently placed by this Court on this privilege, to the effect that it bars evidence of marital communications without regard to whether it is sought to introduce evidence of the marital communication through the testimony of a spouse as a sworn witness in court, or by some other means such as a writing containing statements from one spouse to the other.[7]

### III

Absent an authoritative decision of this Court, the majority adverts to statements I made in a concurring opinion in *People v Hamacher*, 432 Mich 157; 438 NW2d 43 (1989), in response to statements in a dissenting opinion in that case.[8]

---

[7] Or through the testimony of a person who spoke with a spouse.

[8] In *Hamacher*, the defendant was convicted of second-degree criminal sexual conduct. The Court of Appeals, on remand, held that the circuit court should not have admitted testimony by his wife concerning statements he allegedly made regarding his conduct with his stepdaughter. This Court held that the statutory exceptions applicable to the spousal privilege, including the exception for a crime committed against the children of either, did not apply to the communications privilege. This Court further held that it would not consider the prosecutor's contention that Hamacher's failure to object to his wife's testimony at the preliminary examination precluded objection at trial.

One of the justices dissented, asserting that the statutory exceptions to the spousal privilege should be applicable to the communications privilege, and that, in all events, Hamacher had waived the privilege when he failed to object to his wife's testimony at his preliminary examination.

I filed a separate opinion, responding to the statement in the dissenting opinion that there was waiver, and also responding to the following statement in the dissenting opinion:

The confidential communication privilege acts to hold inviolate the privacy of the marital relationship. When facts which might otherwise be privileged are *disclosed for all to inspect*, the purpose of the privilege is destroyed. Just as one cannot unring a bell, a secret once disclosed in open court is never again a wholly private matter. [*Id.*, p 194 (Boyle, J., dissenting).]

The dissenting justice sought to limit the privilege so that it could not be invoked where the privacy of the communication/marital relationship had already been violated by disclosure of the statements:

> When facts which might otherwise be privileged are disclosed for all to inspect, the purpose of the privilege is destroyed. Just as one cannot unring a bell, a secret once disclosed in open court is never again a wholly private matter.[9]

Responding to that statement, I wrote that the communications privilege did not bar a spouse from disclosing a confidential communication to a prosecutor, newspaper reporter or someone else. Nevertheless, although the "secret" would then no

I wrote:

> Section 2162 of the Revised Judicature Act does not purport to bar a spouse from disclosing a confidential communication. Hamacher's wife, without violating § 2162, related the statement she attributed to her husband to social service workers, police officers, the prosecutor, and could have done so to newspaper and other reporters. She could indeed have gone on the nightly news and made a full statement of the confidential communication without violating § 2162. The "secret" would then no longer have been secret and "never again a wholly private matter." Nevertheless, there can be no doubt that despite the wide communication to the world at large of the "secret," Hamacher's wife could not, consistent with § 2162, "be examined" in court with regard to the communication. [*Id.,* p 177 (LEVIN, J., concurring).]

I also wrote:

> The courts have no basis for declaring that the statutory purpose in 1861 was to protect the secrecy of the communication when the statute itself clearly does not purport to do so. There is no basis for concluding in 1989—over one hundred twenty-five years after enactment—that the legislative purpose in 1861 was other than the literally stated purpose of precluding the spouse from "be[ing] examined" in court. [*Id.,* pp 179-180.]

[9] *Id.,* p 194 (BOYLE, J., dissenting).

longer be secret, "Hamacher's wife could not, consistent with § 2162, 'be examined' in court with regard to the communication." I take it that if I had stopped there, the majority would not regard my concurring opinion as support for overruling *O'Toole* and other decisions.

But then I went through the fence, adding that it would be inappropriate, one hundred twenty-five years after enactment of the privilege, to restate, as would the dissent, the purpose of the communications privilege as designed "to protect the secrecy of the communication" or "that the legislative purpose in 1861 was *other than the literally stated purpose of precluding the spouse from 'be-[ing]' examined' in court.*" (Emphasis added.)

A

On more careful study, it is clear that the words "examine" or "examined" are not limited to examination of a witness in court. Neither Ballantine's Law Dictionary, 3d ed, nor Black's Law Dictionary, 4th ed, define either word. Corpus Juris Secundum defines "examine" without reference to the examination of witnesses in court in much the same way as that word is defined in standard English language dictionaries:

> EXAMINE. To inspect or survey carefully; look into the state of; scrutinize and compare the parts of; view or observe in all aspects and relations, with the purpose of forming a correct opinion or judgment; to test by an appropriate method; to inspect carefully; to investigate; scrutinize. The term necessarily implies the power of allowance or rejection, and, in a particular connection, it is only a disputed fact that can be the subject of the examination. [32A CJS, p 855.]

The *Random House Dictionary of the English Language* defines "examine" as follows:

> examine . . . 1. to inspect or scrutinize carefully: *to examine a prospective purchase.* . . . 3. to inquire into or investigate: *to examine one's motives.* 4. to test the knowledge, reactions, or qualifications of (a pupil, candidate, etc.), as by questions or assigning tasks. 5. to subject to legal inquisition; put to question in regard to conduct or to knowledge of facts; interrogate; *to examine a witness; to examine a suspect.* [Second Edition, Unabridged, p 674.]

Similarly, see *Webster's Third New International Dictionary,* p 790. It thus clearly appears that "examine" means to inspect or scrutinize, to inquire into or investigate, to test, to interrogate, and also to examine a witness. The inquiry or interrogation of a witness may thus be in court or out of court—the inquiry or interrogation need not be under oath.

That the inquiry or interrogation of a spouse might not be in court was recognized by the Legislature in 1861, when it enacted the marital privileges, and has been carried forward to this day. The spousal privilege—the privilege against spousal *testimony*[10]—is stated as a privilege against examination *as a witness:*

> A husband shall not be *examined as a witness* for or against his wife without her consent; nor a wife for or against her husband without his consent, except . . . . [MCL 600.2162; MSA 27A.2162. Emphasis added.]

But the marital communications privilege is not limited to examination "as a witness." The privi-

[10] *Ante,* p 563.

lege is stated, rather, without the "as a witness" qualification:

> [N]or shall either, during the marriage or afterwards, without the consent of both, be *examined* as to any communication made by one to the other during the marriage . . . . [MCL 600.2162; MSA 27A.2162. Emphasis added.]

The Legislature thus carefully drew a distinction between "examined as a witness," the privilege against spousal testimony, and "examined," the privilege against use of a marital communication. Clearly, without regard to whether the inquiry or interrogation is in or out of court, a spouse may not be "examined" concerning a marital communication without the consent of both spouses.

The majority claims that its pronouncement today follows "the mandate of strict construction."[11] Adherence to strict construction would, however, require recognition of the distinction between "examined as a witness" and "examined" so clearly drawn by the Legislature over one hundred thirty years ago.

B

I acknowledge my error in stating that the legislative purpose in 1861 was confined to the "literally stated" purpose of precluding a spouse from "be[ing] examined" in court. It is clear from the dictionary definitions that "examine" or "examined" are not literally limited to either examination in court or to examination as a witness.

It is also clear, on the authority of the four earlier statements of this Court in *Bowen, O'Toole, Dunnigan,* and *Salisbury,* on principle, and on the basis of the overwhelming weight of authority in

---

[11] *Ante,* p 579.

other jurisdictions, that the privilege extends to writings from one spouse to another, and generally bars introduction in evidence in court of a marital communication either through the testimony of a witness who spoke with a spouse or in the form of a document containing statements from one spouse to the other.

I must, therefore, dissent from the obiter dictum in my concurring opinion in *Hamacher,* and from the Court's reliance on such a weak reed. Because no other justice signed my concurring opinion, it does not constitute a decision of this Court. My statement in *Hamacher* does not support or justify overruling *O'Toole* and other decisions.

IV

Ordinarily, as in two of the three Court of Appeals decisions relied on by the majority, the hearsay rule will bar the testimony of a person who spoke to a spouse who revealed a confidential marital communication, and will also bar admitting in evidence a writing containing statements from one spouse to the other. In *People v DeWitt,* 173 Mich App 261, 266; 433 NW2d 325 (1988), and *People v Burton,* 177 Mich App 358, 362; 441 NW2d 87 (1989), the Court held that statements claimed to have been made by a spouse and a writing prepared by a spouse were barred by the hearsay rule.

In *DeWitt,* however, before holding that the hearsay rule barred evidence concerning a wife's statements, the Court said that because her statements were introduced through a third person and the wife did not testify, the marital communications privilege was inapplicable. The Court made that statement without reference to *Bowen, O'Toole, Dunnigan,* or *Salisbury,* or any other

authority in this or any other jurisdiction, on the
basis of implication: "The statute clearly states
that neither spouse may be 'examined as a wit-
ness' against the other spouse, *implying* that ei-
ther spouse must testify." (Emphasis added.) Impli-
cation is not a substitute for research of law
concerning how the privilege has been applied in
this and other jurisdictions.

The obiter dictum in *DeWitt* was the only au-
thority cited in *Burton, supra,* p 362,[12] and *People
v Williams,* 181 Mich App 551, 554; 450 NW2d 85
(1989).[13]

While the hearsay rule would ordinarily bar a
witness from testifying, as did the detective con-
cerning what Fisher said to his estranged wife,
and would ordinarily also bar admitting in evi-
dence a writing reciting her statements, the Rules
of Evidence provide that the rules do not apply to
sentencing proceedings. The rules also provide,

---

[12] The Court said:

> The privilege is inapplicable because defendant's wife is not
> being called to testify, nor is defendant being questioned with
> regard to the statement.

[13] The Court said that the "marital privilege is a testimonial privi-
lege which is inapplicable here because defendant's husband was not
required to testify."

The Court considered a ruling by the circuit court suppressing
evidence that the defendant's husband had made a statement to a 911
operator to the effect that a "woman just shot her tenant." *Id.*

The Court held that the 911 operator could testify if the circuit
court determined that "a hearsay exception applied" and that the
tape could be played "if it were otherwise properly introduced." *Id.*

The question whether the privilege should be "limited to *expres-
sions* intended by one spouse to convey a meaning or message to the
other" (emphasis in original), or whether it should extend "to acts,
facts, conditions, and transactions not amounting to communications
at all," is not presented, 1 McCormick, Evidence (4th ed), § 79, pp 296-
297, would limit the privilege to "expressions," but reports that a
large number of courts have construed their statutes as extending to
acts, facts, conditions, and transactions not amounting to expressions.

however, that the privileges *do apply* to sentencing proceedings.[14]

The Court today, in a criminal prosecution, limits the scope of the communications privilege. But the limitation announced today will apply in civil cases as well.[15] The question is therefore broader, and the decision of this Court more far reaching than whether the communications privilege "may be invoked in a *sentencing proceeding* to preclude consideration by the sentencing court of certain extrajudicial statements made by defendant's estranged wife and set forth in the presentence report."[16] (Emphasis added.)

v

Courts generally have had some difficulty deciding whether the communications privilege bars the introduction in evidence of letters from one spouse to another—which, like the presentence report here at issue, are writings containing statements from one spouse to the other. Letters can be mislaid and find their way into the hands of third persons. Many courts have analogized letters that inadvertently come into the hands of a third per-

---

[14] Rule 1101 Applicability

\* \* \*

(b) Rules inapplicable. The rules *other than those with respect to privileges* do not apply in the following situations and proceedings:

\* \* \*

(3) Miscellaneous proceedings. Proceedings for . . . sentencing . . . .

[15] For example, Wigmore states that the rules concerning loss of the privilege respecting documents coming into the possession of a third person are much the same for the attorney-client privilege and the marital communications privilege. 8 Wigmore, Evidence (McNaughton rev), § 2325, p 632; § 2339, p 668.

[16] *Ante,* p 563.

son to statements overheard by a third person[17]
which, because they are not then confidential, are
not protected by the communications privilege.[18]
But courts generally have also concluded that the
privilege bars the introduction of letters deliber-
ately transferred by the addressee spouse to a
third person.

A

McCormick reports that many if not most of the
cases state that the privilege will not be lost if
"the delivery or disclosure of the letter be due to
the *betrayal or connivance* of the spouse to whom
the message is directed." (Emphasis added.) Mc-
Cormick appears to agree with that approach,
stating: "Just as that spouse would not be permit-
ted, against the will of the communicating spouse,
to betray the confidence by testifying in court to
the message, so *he or she may not effectively
destroy the privilege by out-of-court betrayal.*"[19]
(Emphasis added.)

Wigmore similarly states:

(3) *For documents of communication coming
into the possession of a third person, a distinction*
should obtain, analogous to that already indicated
for a client's communications (§§ 2325 and 2326
*supra*). That is, *if they were obtained from the*

[17] 1 McCormick, n 6 *supra*, § 82, p 303.

[18] One of the three statements in the instant case was overheard.
See n 2.

[19] 1 McCormick, n 6 *supra*, § 82, p 303. McCormick also states that
the weight of decision seems to support the view that the privilege
does not protect against the testimony of third persons who have
secured possession or learned the contents of a letter from one spouse
to another by interception, or through loss or misdelivery by the
custodian. The treatise states that if the communicating spouse
"sends a messenger with a letter, he should ordinarily assume the
risk that a chosen emissary may lose or misdeliver the message." *Id.*,
p 304.

*addressee spouse by voluntary delivery, they
should still be privileged (for otherwise the privi-
lege could by collusion be practically nullified for
written communications)*; but if they were ob-
tained surreptitiously or otherwise without the
addressee's consent, the privilege should cease.
The rulings here are not harmonious. [Emphasis
added.]

Decisions in other jurisdictions support McCor-
mick's and Wigmore's statements that the spouse
to whom the communication is made may not
"destroy the privilege by out-of-court betrayal" or
"collusion." *Dalton v People,* 68 Colo 44; 189 P 37
(1920) (husband could not testify concerning letter
written by wife); *Selden v State,* 74 Wis 271; 42
NW 218 (1889) (letters from the defendant to his
wife subpoenaed by the prosecutor were inadmissi-
ble); *Wilkerson v State,* 91 Ga 729; 17 SE 990
(1893) (a letter from the defendant to his wife
delivered by her to the prosecutor was inadmissi-
ble); *Scott v Commonwealth,* 94 Ky 511; 23 SW 219
(1893) (letter from defendant to his wife, which
appears to have been delivered by her to the
prosecutor was inadmissible); *Mahner v Linck,* 70
Mo App 380, 388 (1897) (letters from a husband to
his wife are not admissible "whenever they have
come to the possession of a third party by the
agency of the husband or the wife"); *State v St
John,* 94 Mo App 229; 68 SW 374 (1902) (a commu-
nication from a husband to his wife delivered by
her to a third person was inadmissible); *Cole v
Texas,* 48 Tex Crim 439; 88 SW 341 (1905) (evi-
dence that the defendant husband learned the
contents of a letter from his wife's father to his
wife was inadmissible as a confidential marital
communication); *McCoy v Justice,* 199 NC 602; 155
SE 452 (1930) (letters between a husband and his
wife turned over by her to a third party were

inadmissible); *Martin v State,* 203 Miss 187; 33 So 2d 825 (1948) (the admission of a letter from a wife of a witness to the witness was erroneous).

In *Commonwealth v Fisher,* 221 Pa 538, 544; 70 A 865 (1908), the Supreme Court of Pennsylvania ruled that letters from the defendant to his wife, delivered by her to the district attorney, were inadmissible. The court said that the letters "could not be produced by the wife and offered in evidence as coming from her because this *in effect was permitting the wife to testify against her husband* . . . , which cannot be done under our statute." (Emphasis added.)

Nor is third-party testimony admissible concerning a marital communication that has been divulged. *Brown v Wood,* 121 Mass 137 (1876) (the testimony of third parties to whom a husband and wife repeated details of a transaction was inadmissible). See also *Gross v State,* 61 Tex Crim 176; 135 SW 373 (1911) (a third party who casually read a letter from a husband to his wife cannot testify concerning its contents).

B

Modern cases make the same distinction between inadvertent and deliberate disclosure of letters by a spouse. In *State v Myers,* 230 Kan 697, 702; 640 P2d 1245 (1982), the defendant sought to prevent the admission of letters he had written to his wife that were found by her former landlord and delivered to the police. The Supreme Court of Kansas affirmed the trial court's admission of the letters, stating:

Under the statute, a defendant charged with a crime has a right to *prevent the other from violating the confidentiality of the marital relationship*

*by disclosing a confidential communication.*
Where, however, the confidential communication
*inadvertently and unintentionally* falls into the
hands of a third person, the admission of testi-
mony about the confidential communication would
not constitute a violation of the marital privilege.

In an earlier decision of the Kansas Supreme
Court, *State v Holt,* 223 Kan 34; 574 P2d 152
(1977), the court held that it was error, albeit
harmless error, to have admitted a note[20] from the
defendant to his wife, left by him in the kitchen of
their home and delivered by her to the authorities.

These Kansas cases, *Myers* and *Holt,* are note-
worthy because the thin line of authority relied on
by the majority all trace back to the Kansas case
of *State v Buffington,* 20 Kan 599 (1878), which, as
appears from *Myers* and *Holt,* is no longer fol-
lowed in Kansas. See part C.

In *McCravey v State,* 2 Tenn Crim App 473; 455
SW2d 174 (1970), the Tennessee Court of Criminal
Appeals held that a defendant's letter to his wife,
delivered by her to the authorities, was improperly
admitted in light of the privilege, but the error
was harmless.

The Illinois Court of Appeals, in *People v Gard-
ner,* 105 Ill App 3d 103, 116; 60 Ill Dec 951; 433
NE2d 1318 (1982), affirmed the trial court's exclu-
sion of a letter written by a codefendant to his
wife on the basis of the privilege:[21]

---

[20] The note read:

Jo, I had to kill a person tonight. I will be back soon,
tomorrow night at your mother's place. Please understand.
Garry. [*Id.,* p 38.]

[21] Nitz wrote a letter to his wife, indicating in the body of the letter
that he believed jail authorities were reading his mail. Mrs. Nitz
showed the letter to Mrs. Gardner, Nitz' codefendant's wife and the
Nitzes' daughter, who told her husband about the letter and its

[T]he privilege is not lost even if "the delivery of the letter be due to the betrayal or connivance of the spouse to whom the message is directed." [Quoting *People v Simpson,* 68 Ill 2d 276; 12 Ill Dec 234; 369 NE2d 1248 (1977).][22]

The Court of Appeals of Georgia held that a note left by a husband for his wife shortly before he died as a result of a gunshot, claimed to have been self-inflicted, was inadmissible because it was a confidential marital communication. *Georgia Int'l Life Ins Co v Boney,* 139 Ga App 575; 228 SE2d 731 (1976).

A New York court held that letters written by a wife to her husband were inadmissible, and dismissed an indictment because otherwise there was insufficient evidence. *People v Harris,* 39 Misc 2d 193; 240 NYS2d 503 (1963).

The Supreme Court of Wisconsin held that the rules of privilege, including the marital communications privilege, apply to proceedings before a magistrate for the issuance of a search warrant:

Marital confidences would not be meaningful if a spouse could decide to reveal the confidence to a third person and thereby destroy the protection of the privilege. We conclude that a communication

contents. In the meantime, Mrs. Nitz delivered the letter to her husband's attorney, Reed, who also represented Gardner. Gardner then requested a copy of the letter, and, after receiving permission from Mrs. Nitz, Reed delivered a copy to Gardner. Mrs. Nitz then reclaimed the original letter from Reed. Gardner sought to impeach Nitz at trial with the photocopy. After an in camera hearing, the judge determined that use of the letter would violate both the marital and attorney-client privileges. *Id.,* pp 114-115.

22 The Illinois Court of Appeals has also held that police officers who eavesdrop on a marital conversation with the coöperation of one spouse, assumed by the other spouse to be confidential, are prohibited from testifying about the contents of the conversation by the marital communications privilege. *People v Dubanowski,* 75 Ill App 3d 809; 31 Ill Dec 403; 394 NE2d 605 (1979). Similarly, see *Hunter v Hunter,* 169 Pa Super 498; 83 A2d 401 (1951); *Hicks v Hicks,* 271 NC 204; 155 SE2d 799 (1967).

which is privileged when made remains so, regard-
less of an unauthorized out-of-court disclosure. The
status of the particular marital relationship has
no bearing on whether a privilege exists for mari-
tal communications. The fact that the defendant
was served with a divorce summons shortly after
his wife's disclosures is therefore irrelevant to the
issue here. Sec. 885.18, Stats. 1971, prevents disclo-
sure during the marriage or "afterwards." [*Muetze
v State,* 73 Wis 2d 117, 129-130; 243 NW2d 393
(1976).]

C

The majority adverts to two ALR annotations[23]
and concludes that there is "wide disparity in the
case law in other jurisdictions."[24] Both McCormick
and Wigmore report, however, that the majority of
jurisdictions follow the approach of this Court in
*O'Toole,* holding that the communications privi-
lege bars the admission in evidence of a letter
obtained through the betrayal or connivance of a
spouse, but not a letter obtained through intercep-
tion, loss or misdelivery.[25]

A few courts have, indeed, held that letters from
one spouse to another are not protected by the
privilege even where a spouse deliberately delivers
the letters to a third person. But on examination,
these cases all appear to trace back to *State v
Buffington, supra,* in which the Kansas Supreme
Court analogized to the situation where a third
person inadvertently overhears a conversation be-
tween spouses. As this Court indicated in *O'Toole,*

[23] *Applicability of marital privilege to written communications
between spouses inadvertently obtained by third person,* 32 ALR4th
1177; *Spouse's betrayal or connivance as extending marital communi-
cations privilege to testimony of third person.* 3 ALR4th 1104.

[24] *Ante,* p 571.

[25] See n 18 and accompanying text.

that analogy does not justify holding that the privilege does not bar introduction in evidence of a confidential marital communication *deliberately* delivered by a spouse to a third person.[26]

On principle, there is no reason to distinguish between a deliberate oral statement by a spouse to a third person of a confidential communication, and a deliberate delivery by a spouse to a third person of a written communication. Manifestly—we all agree—a spouse could not be examined in court concerning an oral confidential communication simply because that spouse had deliberately revealed the substance of the communication to third persons. That being the undoubted rule of law, there is no basis in reason for holding that the privilege does not bar the testimony of a witness who spoke to a spouse who reported to the witness a confidential marital communication, or that the privilege does not bar the admissibility of a document containing communications from one

---

[26] In *State v Buffington, supra,* the wife deliberately betrayed the confidence of the communication by causing the letter to be turned over to the prosecutor.

In *State v Hoyt,* 47 Conn 518, 540 (1880), however, it is unclear how the letters came into the possession of the prosecutor. The court said that how the letters were obtained "or whether they were ever in the wife's possession did not appear . . . ."

In *People v Hayes,* 140 NY 484, 495; 35 NE 951 (1894), the letters were to the defendant from his wife. He had delivered his wife's letters to his mistress, which prompted the court to state: "Comment upon the baseness of this act of the defendant is unnecessary." It was the defendant, the addressee spouse, who had delivered the letters to his mistress, who sought to exclude them on the basis of privilege. In ruling against him, the court relied on *Buffington* and *Hoyt,* and said of the defendant that "he, deliberately violating every principle of honor and decency, gives the letters to his mistress, by whom they were delivered to the district attorney. A rule which would still preserve the confidential character of these letters as against *this husband* would be founded upon more sentiment than sense." *Id.,* p 496. (Emphasis added.)

Similarly, see *State v Sysinger,* 125 NW 879 (SD, 1910), *State v Morgan,* 147 La 205; 84 So 589 (1920), and *Hammons v Arkansas,* 73 Ark 495; 84 SW 718 (1905), also relying on *Buffington, Hayes,* and *Hoyt.*

spouse to the other. As stated by Justice Miller of the United States Circuit Court in *Bowman v Patrick,* 32 F 368, 369 (ED Mo, 1887):

> I am quite clear that the wife has no right to publish these communications; that she would not be permitted to produce the letter if she were a witness on the stand; that she could be enjoined from producing the letter if she were supposed to be hostile to her husband . . . .

The ALR article relied on by the majority cites a handful of cases, beginning with *Buffington,* decided in 1878, and concluding with a Louisiana case decided in 1920 for the view it adopts today. A number of the cases cited are not in point.[27] The ALR article, published in 1981, cites no case later than 1920, the pocket part cites no later case, and the majority cites no later case that supports the extreme view, adopted by the majority, that "the mere fact that [written] a marital communication came within the possession or knowledge of a third person is sufficient to render it admissible in evidence."[28]

VI

The majority states that the "undisputed modern trend is toward a restrictive, rather than expansive, interpretation of the privilege."[29] But the majority does not cite a single modern case that, in keeping with that "trend," supports the

---

[27] The Louisiana case decided in 1920, *State v Morgan,* n 26 *supra,* is not in point because the Louisiana statute in terms speaks of "conversations" rather than "communications," and has been consistently construed to apply only to oral communications. *State v Fuller,* 454 So 2d 119 (La, 1984).

See also n 26.

[28] *Ante,* p 571.

[29] *Ante,* pp 573-574.

specific limitation it imposes today, confining the communications privilege to testimony by the spouse as a witness in court.

United States Courts of Appeal, which may expound on the "privileges from the principles of the common law 'in the light of reason and experience' Fed R Evid 501," have recently ruled that an FBI agent who spoke to the defendant's wife should not have been permitted to testify concerning what the defendant was claimed to have said to her,[30] and that a letter turned over to the government by the wife, who had entered into a plea bargain, was inadmissible.[31]

Despite the "trend," the Uniform Rules of Evidence, 1974 Act,[32] and the Model Code of Evidence

---

[30] Although the government in the instant case adduced no evidence that dispelled the assumption of confidentiality, the Court permitted Agent Thomas to testify about statements the defendant made in confidence to his wife. The Court consequently committed error in allowing Thomas to testify about the defendant's comment that his wife was to blame for his predicament. [*United States v Thompson,* 716 F2d 248, 250 (CA 4, 1983).]

The error was found to be harmless.

[31] Recent cases assume the continuing vitality of the communications privilege. See [*United States v Picciandra,* 788 F2d 39, 43 (CA 1, 1986)]; *United States v Ammar,* 714 F2d 238, 258 (CA 3, 1983). In addition, we question the government's theory that the letter fell outside the marital privilege because it "pertained to ongoing or future criminal activity involving both spouses," *Ammar,* 714 F2d at 257. The letter was written after both spouses' arrests and, consequently, after the conclusion of the alleged conspiracy between them. [*United States v Wood,* 924 F2d 399, 402 (CA 1, 1991).]

The error was found to be harmless.

[32] (a) Definition. A communication is confidential if it is made privately by any person to his or her spouse and is not intended for disclosure to any other person.

(b) General rule of privilege. An accused in a criminal proceeding has a privilege to prevent his spouse from testifying as to any confidential communication between the accused and the spouse.

(1942),[33] do not limit the scope of the communications privilege to repetition by the spouse of the marital communication in court.

There have, indeed, been recent changes in the scope of the communications privilege, especially by the federal courts where the privileges are not statutory[34] but the change imposed today finds no support in any recent authority.

---

(c) Who may claim the privilege. The privilege may be claimed by the accused or by the spouse on behalf of the accused. The authority of the spouse to do so is presumed.

(d) Exceptions. There is no privilege under this rule in a proceeding in which one spouse is charged with a crime against the person or property of (1) the other, (2) a child of either, (3) a person residing in the household of either, or (4) a third person committed in the course of committing a crime against any of them. [Uniform Rules of Evidence, 1974 Act, Rule 504, pp 301-302.]

[33] Rule 215. Marital Privilege; Confidential Communication Between Spouses. Subject to Rules 216, 217, 218 and 231, a person, whether or not a party, has a privilege to refuse to disclose, and to prevent a witness from disclosing, a communication, if he claims the privilege and the judge finds that

(a) the communication was a confidential communication between spouses.

Rule 214. Marital Privilege; Definitions.

* * *

(d) "confidential communication between spouses" means information transmitted by a voluntary act of disclosure by one spouse to the other without the intention that it be disclosed to a third person and by a means which, so far as the communicating spouse is aware, does not disclose it to a third person. [Model Code of Evidence, Rules 214 and 215, pp 151-152.]

[34] See n 30 and accompanying text.

In *United States v Parker,* 834 F2d 408, 411 (CA 4, 1987), former Justice Powell, sitting by designation, speaking for the court, reaffirmed the privilege for "[i]nformation that is privately disclosed between husband and wife in the confidence of the marital relationship" adding that in the Fourth and at least one other circuit "marital communications hav[ing] to do with the commission of a crime in which both spouses are participants" are outside the privilege. Similarly, see *United States v Sims,* 755 F2d 1239 (CA 6, 1985).

See also note, *The future crime or tort exception to communications privileges,* 77 Harv L R 730 (1964).

## VII

The majority states that the "unusual situation presented in the instant case" is addressed in *United States v Burton,* 631 F2d 280 (CA 4, 1980) and *State v Minor,* 188 Neb 23; 195 NW2d 155 (1972).

Both courts did indeed hold that it was not violative of a defendant's rights to include in a presentence report hearsay statements made by his wife to a probation officer. As set forth in the quotation from *Burton* in the majority opinion,[35] the wife provided " 'information concerning the defendant's background, character, and conduct.' " In providing such information, said the court, "there was no violation of any privileged marital communication." Clearly there is a substantial

The federal courts have also modified the common law communications privilege where the communication was made after the parties had long been separated and reconciliation appeared to be unlikely. *In re Witness Before the Grand Jury,* 791 F2d 234 (CA 2, 1986). Similarly, see *United States v Jackson,* 939 F2d 625 (CA 8, 1991); *United States v Roberson,* 859 F2d 1376 (CA 9, 1988).

The Missouri Supreme Court stated a crime fraud exception where the defendant asked his wife to provide a false alibi; additionally, the court said that because the defendant intended that his wife communicate what he said to her, what was said was not said in confidence. *State v Heistand,* 708 SW2d 125 (Mo, 1986).

In the instant case, similarly, Fisher's statement to his wife could be viewed as a request to testify and hence not to have been a confidential communication. The Fishers were estranged. But this Court in *People v Hamacher,* 428 Mich 884 (1987), ruled that the statute "contains no exception to the privilege regarding communications between a husband and wife where the husband and wife are separated or are in the process of obtaining a divorce." See also *People v Love,* 425 Mich 691; 391 NW2d 738 (1986); *People v Vermeulen,* 432 Mich 32; 438 NW2d 36 (1989); *People v Hamacher,* 432 Mich 157; 438 NW2d 43 (1989).

[35] *Ante,* p 572. The majority also includes quoted material referring to *Trammel v United States,* 445 US 40, 52, n 12; 100 S Ct 906; 63 L Ed 2d 186 (1980), pertaining to the spousal privilege, which is not here in issue.

difference between providing information concerning a defendant's background, character, and conduct, which need not include the substance of any marital communication, and repetition of a marital communication.

In *Minor,* the Nebraska Supreme Court similarly held that it was not violative of the defendant's rights to include, in a presentence report, hearsay statements of his wife. The court said, as set forth in the majority opinion, that it construed "a wife's *incompetency* in criminal proceedings against her husband to be limited to testimonial utterances." (Emphasis added.) The substance of the hearsay statements made by the wife contained in the presentence report is not set forth in the opinion of the court. There is no basis for inferring that her statements concerned confidential marital communications. The court referred to an earlier decision of the Nebraska Supreme Court, but there is no indication that the information there provided was other than background information.

We have found two cases concerning the applicability of a privilege to presentence reports. In *Southern Blue Grass Mental Health v Angelucci,* 609 SW2d 931 (Ky App, 1980), and *Idaho v Browning,* 121 Idaho 239; 824 P2d 170 (Idaho App, 1992), the intermediate appellate courts of Kentucky and Idaho held that the physician-patient privilege was applicable to presentence reports, and therefore confidential information covered by the privilege could not be considered in sentencing.

I would affirm the judgment of the Court of Appeals on this issue.